[No. A092772. First Dist., Div. Five. July 15, 2002.]

STOREK & STOREK, INC., et al., Plaintiffs and Appellants, v. CITICORP REAL ESTATE, INC., Defendant and Appellant.

[No. A093724. First Dist., Div. Five. July 15, 2002.]

STOREK & STOREK, INC., et al., Plaintiffs and Appellants, v. CITICORP REAL ESTATE, INC., Defendant and Respondent.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.B.

## COUNSEL

Bien & Summers, Elliot L. Bien; Joseph R. Grodin; Tuttle & Taylor, Douglas W. Beck, E. Robert Wallach and Marshall W. Krause for Plaintiffs and Appellants.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Steven L. Mayer, Kimberly A. Bliss; Shearman & Sterling, R. Paul Wickes, Amanda J. Gallagher, Adam S. Hakki and Meghan O. Powell for Defendant and Appellant and for Defendant and Respondent.

## OPINION

**STEVENS, J.**—This lawsuit arises out of a failed real estate development project. The disappointed investors sued the lender, who had refused to continue financing the project, alleging breach of the implied covenant of good faith and fair dealing and fraud in the inducement of the loan agreement. The jury awarded plaintiffs $900,001 on the contract claim and $40.92 million for fraud. We conclude that the judgment must be reversed.

### I. FACTS

Three limited partnerships formed and controlled by Glenn and Richard Storek (the Storeks) and collectively referred to as "Old Oakland" undertook a redevelopment project in downtown Oakland to restore and convert several 19th-century Victorian buildings into office and retail space. Storek & Storek, Inc., also owned by the Storeks, was the project architect, developer, and building manager.

To fund the project, Old Oakland borrowed $30 million in 1984 from the City of Oakland. The city, in turn, raised that money by issuing industrial development bonds backed by letters of credit from Citibank.[1] As security for Old Oakland's agreement to reimburse Citibank for any draws on the

---

[1] The city had initially authorized $55 million for a larger project, but ultimately the city issued only $30 million in bonds.

letters of credit, Citibank obtained a deed of trust on Old Oakland's property and junior deeds of trust on two pieces of San Francisco property owned by other partnerships controlled by the Storeks—a commercial building at 530 Bush Street and another at 50 Grant Avenue.

By 1988 it became clear that the bond funds would be insufficient to complete the project, and Old Oakland approached Citicorp Real Estate, Inc. (Citicorp), a subsidiary of Citibank, to request a loan. In August 1989 the parties entered into a construction loan agreement (loan agreement) by which Citicorp agreed to lend Old Oakland up to $8.9 million.[2]

The renovation project at this point was in the leasing stage, and the loan agreement provided detailed monthly budgets for the use of funds for the anticipated costs to complete the leasehold improvements. The total costs were projected to be $15.4 million for construction and financing, with the funding to come from a combination of the Citicorp loan, equity contributions, and Old Oakland's operating income. The equity contributions included $3.8 million to be obtained from refinancing the Storeks' property at 530 Bush Street plus an additional $1 million to be raised by Old Oakland through a tax credit syndication. In the period prior to signing of the loan agreement, Citicorp made two bridge loans to Old Oakland, totaling $5.1 million, to enable construction to continue. When the property at 530 Bush Street was eventually refinanced (by an unrelated lender), the bridge loans were repaid and $3.8 million in capital was put into Old Oakland.

Citibank (the parent corporation) already held deeds of trust on the Old Oakland project property and the San Francisco properties as security for the bonds. As security for the loan agreement, Citicorp received a second deed of trust on the Old Oakland property and junior liens on the properties at 530 Bush Street and 50 Grant Avenue. Moreover, the loan agreement gave Citicorp tight control over disbursements of the loan proceeds to ensure adherence to the project budget. Each month, Old Oakland was required to submit a request for disbursement of loan funds together with progress

---

[2]At that time the Storeks had various grievances with Citibank, including claims that the bank had demanded excessive collateral for its letters of credit, that it had refused to back the full $55 million bond authorization, and that it had endangered the tax-exempt status of the bonds by forcing Old Oakland to use proceeds from the sale of limited partnership interests before any more bond proceeds were disbursed. Under the terms of the loan agreement, Old Oakland released Citibank from any and all claims and liability arising out of the bond transactions. (Loan agreement, § 8.26.)

schedules and a current (revised) project budget. (Loan agreement, § 3.01.)[3] Old Oakland represented that the loan funds, together with additional funds provided by Old Oakland, would "at all times be sufficient" to complete the project. The loan agreement authorized Citicorp to require Old Oakland to raise additional capital "[i]f at any time the Lender determines (in the Lender's sole judgment) that such funds to be deposited are not or shall not be sufficient to pay all of such costs and to satisfy such interest obligations . . . ." (§ 2.02(b).)

Under section 3.02 of the loan agreement, Citicorp's obligation to make any disbursements was subject to a number of conditions precedent, including the following conditions significant to this appeal: First and foremost, the project budget was required to be "in balance" such that "No determination shall have been made by the Lender that the undisbursed amount of the Loan is less than the amount required to pay all expenses in connection with Completion of the Construction Improvements, including, but not limited to, any extra Work, unless the Borrower shall have deposited in the Construction Account an amount at least equal to the amount of such deficiency . . . ." (§ 3.02(a)(ii).)

Second, Citicorp's obligation to disburse loan funds arose only if the contractually defined "leasing criteria" were met. That is, with its monthly request for disbursements, Old Oakland was required to deliver an executed lease of the space to be improved plus the proposed specifications and cost breakdowns for the tenant improvements, and the costs were not to exceed $16.56 per square foot of retail space or $35 per square foot of office space. (§§ 3.01(c)(ii)(F), 3.02(a)(xii).)

A third condition to Citicorp's obligation to disburse the loan funds was that "No Event of Default or Potential Default shall have occurred and be continuing." (§ 3.02(a)(i).) A default, in turn, was defined by the loan agreement to include any proceeding for bankruptcy or receivership for the properties secured by Citibank's deeds of trust if an order for relief remained in effect beyond 60 days. (§ 7.01(d).) Such default would automatically terminate Citicorp's obligation to disburse loan funds. (§ 7.01(s)(5).) A default also included the occurrence of any default under the agreements for reimbursement of the bond funds or any default on the San Francisco properties. (§ 7.01(o), (p), (q), (s).) Such a default terminated Citicorp's obligation to make further loan disbursements upon Citicorp's written notice. (§ 7.01(s)(5).)

---

[3]Unless otherwise indicated, all further section references refer to the construction loan agreement, dated August 18, 1989.

For the first three months after the loan agreement was executed, from August to November 1989, Citicorp disbursed funds totaling $3.8 million to reimburse Old Oakland for expenditures incurred back to January 1989. In November 1989, however, Citicorp received a report from its construction monitor that the tenant improvement costs were running "very much over the [original] budget" and that the available funds would be insufficient to complete the project. For one thing, a shortfall existed because Old Oakland had never raised the $1 million in equity capital called for by the project budget. Moreover, Old Oakland had been unable to obtain significant contributions from tenants toward the leasehold improvements. And further, the construction monitor reported that the tenant improvements exceeded the contractual limits on the cost per square foot and projected that the costs to build out future spaces would have the same cost overruns. Extrapolating from the current cost overruns, the construction monitor calculated future cost overruns to be several million dollars.

On November 6, 1989, Citicorp notified Old Oakland that its September requisition would not be funded because the expenses were over budget. On November 25, Citicorp outlined the actual and projected cost overruns and further noted Old Oakland's lack of operating income. Citicorp was aware that the costs for the early tenants were frequently higher than for later tenants. Citicorp asked Old Oakland to submit a plan for bringing the budget into balance, either by showing that it had raised additional funds or had identified sufficient cost savings. Old Oakland's written responses acknowledged that the budget was out of balance. However, the Old Oakland representatives complained to Citicorp that some of the cited "excess" tenant improvements had been completed before the loan agreement was executed and that Citicorp had full knowledge of those costs beforehand and had paid the requisitions.

Old Oakland never submitted a written plan for bringing the project budget into balance. However, in January 1990, the Storeks submitted a written proposal for funding above the $8.9 million budget of the loan agreement in order to complete the project. This proposal had two alternative plans. One would expand the project to include restaurants and entertainment sites in addition to the office and retail space and would entail new financing of $9.5 million.[4] The secondary plan would increase the funding for tenant improvements to meet higher-than-expected costs as a means to attract stronger tenants. Even this smaller plan called for $5.6 million in additional

---

[4]This expansion of the project had been proposed before, but Citicorp had declined to provide the additional financing until Old Oakland acquired more tenants and established some steady income.

funding. The Storeks had various ideas for obtaining the new funding, none of which involved a new loan from Citicorp.

According to plaintiffs' evidence at trial, during the negotiations leading to the loan agreement, the Storeks on behalf of Old Oakland had represented to Citicorp that $8.9 million would be sufficient to complete the project in a "plain vanilla" form. However, the Storeks informed Citicorp that more money would be necessary to expand the project or to upgrade the tenant improvements, and Citicorp assured the Storeks that the bank would "cooperate" to make Old Oakland a success. The Storeks testified that Citicorp showed some interest in the January 1990 expansion proposal but made no commitments. At the same time, the Storeks gave verbal assurances to Citicorp that the project could be completed in its "plain vanilla" form with the funds available.

On January 24, 1990, Citicorp informed Old Oakland that it was not in compliance with the loan agreement and that Citicorp would not fund the project until Old Oakland's "timely infusion of sufficient equity to complete Tenant Improvements in progress." In particular, Citicorp's letter advised Old Oakland that Citicorp would not waive the contractual conditions precedent for funding. Nevertheless, Citicorp did subsequently disburse some additional funds for past requisitions, totaling $3.3 million, despite its determination that the project budget was out of balance.[5]

In April 1990 Old Oakland informed Citicorp that it had been unable to obtain any new funding. In May 1990, an unrelated lender (California Federal Savings and Loan Association) filed a complaint for appointment of a receiver and for foreclosure against 50 Grant Avenue—property that had been pledged to Citibank as security for the bonds. Under the terms of the loan agreement, a receivership lasting more than 60 days constituted a default. (§ 7.01(d).) Hence, by July a default in the loan agreement had occurred. In August 1990 the partnership owning the 50 Grant Avenue building filed for bankruptcy. This event again placed Old Oakland in default under the loan agreement, as did the subsequent bankruptcy of 530 Bush Street. (§ 7.01(c).) The two San Francisco properties were eventually foreclosed by their respective senior lenders.

On August 31, 1990, Citicorp notified Old Oakland that it was in default under the loan agreement "for lack of financial reporting, material adverse

---

[5]Notwithstanding any failure of a condition precedent, Citicorp was allowed to make disbursements if it determined, in its sole discretion, that making the disbursements would be advisable. However, the making of a disbursement without satisfaction of all conditions precedent would not constitute a waiver of such conditions with respect to subsequent disbursements. (§ 3.02(b).)

change in the condition of the borrower, bankruptcy of related collateral, and the Borrower's failure to maintain the collateral free of liens" and that no further loan funds would be disbursed. At that point, Citicorp had disbursed all but $900,001 of the agreed-upon $8.9 million.

Earlier, Citicorp had automatically (without a requisition from Old Oakland) disbursed loan funds each quarter to Citibank to pay the interest on the $30 million bonds that had been issued by the city. In September 1990, however, Citicorp refused to make the disbursement from the loan proceeds. The bond trustee then made a demand on Citibank pursuant to its letters of credit, and Citibank paid the interest of $385,201. Citibank then demanded reimbursement from Old Oakland, but Old Oakland was unable to meet the demand inasmuch as Citicorp had cut off the funds. This event, too, constituted a default under the loan agreement. (§ 7.01(o), (p), (q).)

To avoid an actual default on the bonds, Citicorp arranged to pay the interest from its own assets and then charged it as a "soft cost allocation" to the construction loan account. An affiliate of Citibank eventually purchased all the bonds.

On September 7, 1990, Citibank sent Old Oakland a notice of default under its reimbursement agreement based on Old Oakland's failure to reimburse the interest on the bonds, and Citicorp sent Old Oakland a notice of default under the loan agreement based on Old Oakland's default under the reimbursement agreement with Citibank. On September 13 Citicorp recorded a notice of default and subsequently filed a complaint for judicial foreclosure of its deed of trust on the Old Oakland property. Citicorp's internal "action plan" reflects that Citicorp waited to proceed to foreclosure until after the leased space had been outfitted for the tenants and occupied. On December 9, the court found Old Oakland in default and appointed a receiver. On December 15, Old Oakland filed for bankruptcy. The bankruptcy court allowed Citibank to foreclose its deed of trust, and at the foreclosure sale an affiliate of Citibank (Oakland Victorians Realty, Inc.) purchased the property with a full credit bid of $6 million. At that point, Citibank did put money into the project to complete the construction.

## II. PROCEDURAL HISTORY

In 1994 the present lawsuit was filed against Citicorp and Citibank by the bankruptcy trustees for Old Oakland, for 530 Bush Street, and for 50 Grant Avenue, and by Storek & Storek, Inc. Subsequently, a group of Old Oakland investors (Glenn Storek and 39 limited partners) purchased the claims from the bankruptcy trustees and were substituted in as plaintiffs. The complaint

alleged causes of action for, among other things, breach of contract, breach of the implied covenant of good faith and fair dealing, promissory fraud, and fraud by concealment.

The first trial resulted in a hung jury. In the course of that first trial, Citicorp moved for nonsuit, and the trial court expressed doubt whether plaintiffs had established a breach of contract arising from Citicorp's failure to disburse the loan funds. Thereafter, plaintiffs dismissed their cause of action for breach of the loan agreement. They also dismissed other causes of action for breach of fiduciary duty, conversion, and intentional interference with prospective economic advantage. The matter went to the jury only on plaintiffs' causes of action for breach of the implied covenant of good faith and fair dealing, promissory fraud, and fraud by concealment. Storek & Storek, Inc., and the partnerships owning 530 Bush Street and 50 Grant Avenue, who were not parties to the loan agreement, proceeded only on fraud.

It was plaintiffs' theory that Citibank and Citicorp deliberately engineered the collapse of Old Oakland. Plaintiffs contended that Citicorp entered into the loan agreement without any intent to finance the project fully but merely to keep the renovation project going until Old Oakland suffered a monetary default on the bonds so that Citibank could foreclose. Plaintiffs asserted that Citicorp intended to use the budget balance provisions of the loan agreement unjustifiably to benefit Citibank so as to cut off the funding, thereby precipitating foreclosure and enabling an affiliate to acquire the Old Oakland property for a fraction of its value. In support of that theory, plaintiffs argued that Citicorp deliberately set the cost limitations for tenant improvements at such a low level that Citicorp could make an out-of-balance determination at any time. Plaintiffs also emphasized evidence that Citicorp's out-of-balance determination in November 1989 was based on cost overruns on tenant improvements that had already been completed before the loan agreement was signed. Further, plaintiffs pointed to evidence that after making the out-of-balance determination Citicorp continued to fund items that would benefit its own interests (i.e., "hard" costs for physical improvements plus interest payments to Citibank on the bonds) while cutting off "soft" costs (such as the salaries for the leasing staff) that were needed to keep the project operational.

At the conclusion of the second trial, by special verdict the jury found Citicorp liable and awarded Old Oakland $900,001 for breach of the implied covenant of good faith; and awarded Old Oakland, the partnership owning

530 Bush Street, and Storek & Storek, Inc., $40.92 million for fraud.[6] The trial court ruled that because only Citicorp was a party to the loan agreement, only the assets of Citicorp would be considered for calculating punitive damages, not the assets of Citibank. This ruling was deemed a directed verdict for Citibank. The trial court also granted a directed verdict for Citicorp on punitive damages, ruling that plaintiffs were ineligible for punitive damages because they were assignees of the original plaintiffs. The trial court denied Citicorp's motions for judgment notwithstanding the verdict and for a new trial, and judgment was entered in favor of plaintiffs aggregating $41.82 million. Citicorp appeals. Plaintiffs cross-appealed and also filed a separate appeal from the post-judgment order on attorney fees. We consolidated the two appeals.

## III. Discussion

### A. *Breach of Covenant of Good Faith*

The first issue before us pertains to the jury's verdict on the cause of action for breach of the implied covenant of good faith and fair dealing. At the outset, it bears emphasizing that plaintiffs' only contract claim was that Citicorp breached the *implied* covenant; plaintiffs dismissed their cause of action for breach of the *express* terms of the loan agreement.

 Plaintiffs' claim was that Citicorp's determinations beginning in November 1989 that the project budget was out of balance were made in bad faith and that Citicorp breached the implied covenant of good faith and fair dealing when it withheld the loan funds based on those bad faith determinations. The jury obviously agreed and awarded plaintiffs $900,001 for breach of the implied covenant of good faith—exactly the amount of funds left undisbursed from the $8.9 million loan.[7] Citicorp now maintains that the judgment must be reversed because as a matter of law there could be no breach of the implied covenant of good faith and fair dealing when its offending conduct—withholding loan disbursements—was authorized by the express terms of the contract.[8]

Plaintiffs respond by mischaracterizing Citicorp's argument as a challenge to the sufficiency of the evidence to support the jury's finding of a breach of

---

[6]The fraud damage award consisted of $22.62 million for Old Oakland, $13.4 million for 530 Bush Street, and $4.9 million for Storek & Storek, Inc. The jury found no fraud in connection with 50 Grant Avenue.

[7]The loan agreement precluded an award of consequential damages, such as lost profits, for a breach of the contract. (§ 8.25.) Hence, the parties stipulated that plaintiffs' damages on the contract claim were limited to $900,001, and the jury awarded just that amount.

[8]We initially concluded that Citicorp had waived the point by failing to present the issue to the trial court for decision. On rehearing, however, we are persuaded that Citicorp's motions

the covenant of good faith. Plaintiffs mistakenly presume that the question whether the covenant of good faith contradicted the express terms of the loan agreement was a question of fact for the jury. (Indeed, the issue was presented to the jury under the instructions set out in fn. 9, *post*.) However, we conclude that the issue posed by Citicorp is a question of law that requires us to examine whether Citicorp owed a duty to act in good faith when deciding whether to disburse the loan funds. The essential historical facts were undisputed. Moreover, there was no dispute as to the meaning of the decisive terms of the loan agreement. ■ Under these circumstances, when there was no extrinsic evidence to indicate conflicting interpretations of the contract, we make an independent determination as to the obligations of each party under the contract. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].) As we will explain, we conclude that Citicorp was required to make only an objectively reasonable determination that the project budget was not in balance; Citicorp had no duty to act in subjective good faith when making that determination.

■ It has long been recognized, of course, that every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619].) The Supreme Court has clarified, however, that an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [6 Cal.Rptr.2d 467, 826 P.2d 710] (*Carma*).)[9]

In *Carma*, a commercial lease expressly gave the lessor the right to terminate the lease and recapture the leasehold upon notice of the tenant's intent to sublet. After the tenant relocated its headquarters out of the area, it submitted a notice of intent to sublet approximately 80 percent of the premises. The lessor responded with a notice of termination and then (unsuccessfully) pursued negotiations of a new lease with the proposed subtenant, seeking to secure for itself the higher rents. The tenant obtained a

---

in the first trial for summary judgment, nonsuit, and judgment, together with its proposed jury instructions in the second trial, adequately preserved the issue for review.

[9]The jury here was so instructed: "In every contract or agreement there is an implied promise of good faith and fair dealing. This means that each party impliedly agrees not to do anything to destroy or injure . . . . the right of the other to receive the benefits of the contract. Thus, each party has the duty not to prevent or hinder performance by the other party. [¶] However, the law does not imply any promise or duty that is contrary to the express terms of the written agreement between the parties."

judgment for breach of the implied covenant of good faith and fair dealing, but the Supreme Court directed that judgment be entered in favor of the lessor. The court held as a matter of law that because the lessor's termination of the lease was expressly permitted by the lease and clearly within the parties' expectations, such conduct could never violate an implied covenant of good faith and fair dealing. (*Carma, supra,* 2 Cal.4th at pp. 351, 371-376.)

The *Carma* court reasoned as follows: "It is universally recognized [that] the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. [Citations.] . . . [¶] . . . [¶] We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms. [Citations.] 'The general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. . . . [¶] This is in accord with the general principle that, in interpreting a contract "an implication . . . should not be made when the contrary is indicated in clear and express words." [Citation.] . . . [¶] As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.' [Citation.]" (*Carma, supra,* 2 Cal.4th at pp. 373-374; see also *New Hampshire Ins. Co. v. Ridout Roofing Co.* (1998) 68 Cal.App.4th 495, 504-505 [80 Cal.Rptr.2d 286].)[10]

 In the present case, Citicorp was expressly authorized by section 3.02(a)(ii) of the loan agreement to withhold loan funds if the project budget

___

[10]Similarly, it has been held that the implied covenant of good faith and fair dealing does not impose an affirmative duty on a party to forbear from enforcing rights expressly given under the contract. (*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 479 [261 Cal.Rptr. 735].) The plaintiffs in *Price* had obtained a secured loan from a bank that was repayable, according to the promissory note, six months after the loan was made. After the due date, the plaintiffs initiated discussions to restructure the loan, but the bank insisted on repayment and eventually began foreclosure proceedings. The plaintiffs made no claim that the bank breached any express contractual obligations, but they argued that the bank breached the implied covenant of good faith and fair dealing "by taking a 'hard line' in repayment negotiations." The court rejected that theory and upheld the grant of summary judgment in favor of the bank: "The necessary implication of appellants' argument is that the bank owed them a duty of reasonable forbearance in enforcing its creditor's remedies. They do not, however, cite any authority supporting this proposition, and we are aware of none. Contracts are enforceable at law according to their terms. The covenant of good faith and fair dealing . . . . does not impose any affirmative duty of moderation in the enforcement of legal rights. The equitable doctrines of estoppel or waiver may, of course, bar unfair tactics in the

was "out of balance" such that the anticipated expenses exceeded available funds. Clearly it was within the parties' expectations that Citicorp would regularly determine whether the project budget was in balance. Under section 3.01 of the loan agreement, Old Oakland was required to submit along with its monthly requests for disbursements a current project budget and "evidence satisfactory to the Lender" that the leasing criteria had been met. The obvious purpose for this documentation was to enable Citicorp to make its determination whether the conditions precedent had been met for disbursement of the loan funds.

The offending conduct of the defendant was likewise expressly allowed under the contract in *Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798 [48 Cal.Rptr.2d 747] (*Third Story Music*). There the parties had an agreement whereby Warner Communications agreed to manufacture, sell, distribute, and advertise the works of Tom Waits, but the agreement further provided that Warner "may at our election refrain from any or all of the foregoing." (*Id.* at p. 801.) The plaintiff sued for breach of the implied covenant of good faith and fair dealing, claiming that Warner had impeded the plaintiff from receiving the benefits of the contract, but the court affirmed the trial court's sustaining of Warner's demurrer. The court concluded as a matter of law that because the agreement gave Warner discretionary power and expressly allowed Warner to refrain from marketing the Waits recordings, Warner had no duty of good faith in exercising its discretion. (*Id.* at pp. 808-809.)

The court's analysis in *Third Story Music* is instructive and compelling. After a thorough review of the case law, the court explained that when a party is given absolute discretion by express contract language, the courts will imply a covenant of good faith and fair dealing to limit that discretion in order to create a binding contract and avoid a finding that the promise is illusory. However, when the contract is adequately supported by adequate consideration regardless of the discretionary power, there is no need to impose a covenant of good faith in order to create mutuality. "The conclusion to be drawn is that the courts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement." (*Third Story Music, supra,* 41 Cal.App.4th at p. 808.)

In *Third Story Music,* the court noted that Warner's promise to market the Waits recordings at its election would have been an illusory promise had it

---

enforcement of agreements, but appellants have not raised any such equitable defenses." (*Price, supra,* at p. 479.)

been the only consideration given, and a promise to use good faith would have necessarily been implied in order to make it enforceable. However, because Warner gave other consideration—a promise to pay a guaranteed minimum amount no matter what efforts were undertaken—a covenant of good faith was not necessary to render the agreement binding. Accordingly, the court held that Warner owed no duty to act in good faith when exercising the discretion expressly granted to it by the contract. (See also *PMC, Inc. v. Porthole Yachts, Ltd.* (1998) 65 Cal.App.4th 882, 891-892 [76 Cal.Rptr.2d 832].)

In the present case, Citicorp contends *Carma* and *Third Story Music* are controlling because Citicorp, too, had absolute discretion under the loan agreement to refrain from making loan disbursements. ■■■■ We disagree with Citicorp in this respect.[11] Under the plain language of the loan agreement, Citicorp's obligation to make the loan disbursements was not discretionary; Citicorp's obligation was *conditional* upon the fulfillment of a condition precedent, namely, Citicorp's satisfaction that the project budget was in balance.[12]

■ When, as here, a contract provides that the satisfaction of one of the parties is a condition precedent to that party's performance, two different

---

[11] Oddly, plaintiffs asserted below that Citicorp had discretionary power and was obligated to exercise that power in good faith. On appeal, however, plaintiffs now contend that Citicorp had no discretion under the loan agreement. Yet, at the same time, plaintiffs present the argument that Citicorp, while it did not have discretion, did have "leeway" to determine whether the loan was out of balance and that Citicorp was obligated to use good faith in exercising its "leeway." We reject the contention.

The "leeway" possessed by Citicorp was nothing more than the election available to any contracting party to waive a condition precedent to performance. That is, Citicorp had the option to waive the balance requirement, and the record indicates, of course, that Citicorp several times did so and made loan disbursements even though it had determined the project budget was out of balance. Under the express terms of the loan agreement such disbursements did not constitute a waiver of the conditions precedent to subsequent disbursements. (*Ante,* fn. 5.) Moreover, under general contract principles, in the absence of consideration or estoppel, a waiver of a condition precedent may be retracted and the condition may be restored at any time. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 769, p. 695.) Under the circumstances here, Citicorp was free to insist that the condition precedent be satisfied and the project budget be in balance before further loan proceeds were disbursed.

[12] There was no dispute at trial that Citicorp's obligation to disburse the funds was conditional upon Old Oakland's compliance with the conditions precedent.

In its briefs on appeal, Citicorp recognizes the conditional nature of its obligation, asserting that the loan disbursements were conditioned upon Old Oakland's provision of $1 million in equity capital plus its adherence to the contractual cost limitations. Unlike the latter, the former was not an express condition precedent. Old Oakland's obligation to contribute $1 million was not included in the text of the loan agreement; it appeared only as a budget line item as an equity contribution. Old Oakland's obligation to make that equity contribution must be seen as part of the overarching condition that the budget be in balance.

tests are recognized: (1) the party may make a purely subjective decision but it must be made in good faith; or (2) the party must make the decision in accordance with an objective standard of reasonableness. (*Mattei v. Hopper* (1958) 51 Cal.2d 119, 123 [330 P.2d 625] (*Mattei*); *Tiffany v. Pacific Sewer Pipe Co.* (1919) 180 Cal. 700, 702 [182 P. 428, 6 A.L.R. 1493]; *Guntert v. City of Stockton* (1974) 43 Cal.App.3d 203, 209 [117 Cal.Rptr. 601] (*Guntert*); *Kadner v. Shields* (1971) 20 Cal.App.3d 251, 259 [97 Cal.Rptr. 742] (*Kadner*).) In this context, reasonableness and good faith are distinct concepts. A decision is unreasonable when it is arbitrary, capricious, or lacking in evidentiary support. A lack of good faith, on the other hand, suggests a moral quality, such as dishonesty, deceit, or unfaithfulness to duty. (*Guntert, supra,* at pp. 210-211.) When the promisor has the power to make a purely subjective decision, that decision must be made in good faith, but the courts will not examine its reasonableness. (*Hall v. Webb* (1924) 66 Cal.App. 416, 422-424 [as long as riparian owners honestly determined their water supply was lessened, it was immaterial whether that determination was illogical or incorrect]; see also *Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354, 363 [66 Cal.Rptr.2d 921] (*Locke*); *Schuyler v. Pantages* (1921) 54 Cal.App. 83, 86-87 (*Schuyler*).) Conversely, when the promisor's satisfaction is evaluated under the objective test, the validity of the promisor's decision of satisfaction or dissatisfaction rests only on the reasonableness of the decision; the courts will not examine good faith. (*Guntert, supra,* at p. 211.)

*Guntert* illustrates the latter point. In that case, the city leased certain waterfront property to a tenant, but the lease allowed the city to terminate the lease when the city council was satisfied with a development proposal for the property from a third party. In a lawsuit by the tenant, the trial court found that the city terminated the lease unreasonably and in bad faith when it failed to inquire into the feasibility of the third party's development proposal or its ability to finance it. (*Guntert, supra,* 43 Cal.App.3d at p. 207.) The appellate court upheld the trial court's decision on the ground that the city acted unreasonably, but the court declined to examine whether the city acted in good faith, finding reasonableness to be the only standard by which to evaluate the city council's satisfaction with the development proposal. (*Id.* at pp. 211, 217.)

The choice of objective or subjective test to evaluate a promisor's satisfaction depends upon the intent of the parties, as expressed in the language of the contract. In the absence of a specific expression in the contract or one implied from the subject matter, the preference of the law is for the less arbitrary reasonable person standard. (*Guntert, supra,* 43 Cal.App.3d at

pp. 209-213; *Kadner, supra,* 20 Cal.App.3d at pp. 262-263.) The reasonableness test is especially preferable when factors of commercial value or financial concern are involved, as distinct from matters of personal taste. (*Kadner, supra,* at pp. 264-267; see also *Mattei, supra,* 51 Cal.2d at p. 123.) Here, of course, the contract was a commercial transaction involving the lending of money. The decision to be made by Citicorp as to whether the project budget was in balance was a matter entirely of financial concern and had no implications for aesthetics or other aspects of personal taste.

The present case is distinguishable from *Locke, supra,* 57 Cal.App.4th 354, which involved matters of artistic judgment. In that case, a movie studio had an agreement with actress Sondra Locke that gave the studio the right of first refusal over Locke's movie project proposals and the right to use her services as a director. When the studio declined to develop any of her proposals, Locke sued for breach of contract, claiming the agreement was a sham. The appellate court reversed the trial court's grant of summary judgment and held that a question of fact existed on whether the studio violated the implied covenant of good faith and fair dealing. The development agreement allowed the movie studio to make its own subjective creative decisions about Locke's movie proposals, and the court applied the general principle that when a condition of a promisor's duty is subjective satisfaction with the promisee's performance, the promisor is nonetheless required to exercise his subjective judgment honestly and in good faith pursuant to the implied covenant of good faith and fair dealing. (*Id.* at pp. 363, 367.) The court found the rule of *Carma* and *Third Story Music* inapplicable because the development agreement "did not give [the movie studio] the express right to refrain from working with Locke. Rather, the agreement gave [the studio] discretion with respect to developing Locke's projects. The implied covenant of good faith and fair dealing obligated Warner to exercise that discretion honestly and in good faith." (*Locke, supra,* at p. 367, italics omitted.)

Because the decision of the movie studio involved matters of artistic judgment, *Locke* applied the *subjective* test for determining the satisfaction of the movie studio as a condition precedent to its performance. That test allows the promisor to make a purely subjective decision, as long as the promisor exercises its subjective judgment in good faith. (See also *Schuyler, supra,* 54 Cal.App. at pp. 85-87 [contract to produce vaudeville act].) Here, however, in contrast to *Locke,* the determination of Citicorp involved matters of financial calculations. The proper method for evaluating Citicorp's satisfaction with the budget balance was the *objective* test— whether a reasonable person would be satisfied.

The rationale behind the two tests for evaluating a promisor's satisfaction relates to the familiar issue of whether a promise is illusory. When a condition precedent to a promisor's performance calls for satisfaction as to commercial value, the contract is not illusory because the promisor's ability to claim dissatisfaction is limited by the standard of reasonableness. On the other hand, when the promisor's satisfaction deals with matters of fancy, taste, or judgment, the promisor's judgment is purely subjective. The covenant of good faith is implied in order to set a limit on the promisor's ability to express dissatisfaction and thereby supply adequate consideration to support the contract. (*Mattei, supra,* 51 Cal.2d at pp. 123-124.)

Parallel reasoning applies when the promisor is expressly given absolute discretion to perform and when the promisor's performance is expressly conditional upon the promisor's satisfaction. In both instances, courts will imply a covenant of good faith to limit the promisor's express contractual authority only when necessary to create mutuality. (*Mattei, supra,* 51 Cal.2d at pp. 123-124; *Third Story Music, supra,* 41 Cal.App.4th at p. 809.) When, as in *Third Story Music,* the promisor has discretion to perform but has given other consideration or, when, as here, the promisor's performance is conditional on his objectively reasonable satisfaction, then the promisor's ability to avoid performance is sufficiently curtailed, the promise is not illusory, and the covenant of good faith and fair dealing need not be implied to create a binding promise.

This analysis leads us to conclude that Citicorp owed no duty of good faith in determining whether the conditions precedent to its performance had been fulfilled. The loan agreement was a freely negotiated contract entered into by sophisticated business entities. Under the terms of that contract, expressly agreed to by Old Oakland, Citicorp's obligation to disburse the loan funds was conditional on its objectively reasonable determination that the project budget was in balance. No obligation to act in good faith can be implied to contradict or limit that express condition precedent. No inquiry into good faith can be made.

■■ ■■ ■■ In our view, the jury was incorrectly instructed to evaluate Citicorp's determination regarding the loan balance for both reasonableness *and* good faith:[13] "A contract may give one of the parties discretionary power to take certain actions to protect its interests or to make

---

[13]The question whether a duty to act in good faith should be implied must be distinguished from the question whether a covenant of good faith that is implied has been *breached.* On the latter question, the concepts of objective reasonableness and subjective good faith do merge. The Supreme Court has said that the implied covenant of good faith and fair dealing has both a subjective and an objective component—subjective good faith and objective fair dealing. "A

sure that it will receive the benefits of the contract. When the contract does this, the implied promise of good faith and fair dealing requires the party to act in good faith and to deal fairly with the other party in deciding whether to use that discretionary power and in deciding what actions to take. This means that the party who is given a discretionary power to do something to protect its own interests may not use that discretionary power to unreasonably or unfairly harm the other party or to deprive the other party of the benefits of the contract. [¶] For example, with regard to the [loan agreement] out-of-balance provision, [*Citicorp*] *was required to act reasonably and in good faith in determining whether the loan was or was not out of balance.*" (Italics added.)[14] We hold to the contrary. Citicorp had no duty to act in good faith in determining whether the condition precedent to its performance had been fulfilled. Citicorp was required only to act reasonably.

Consequently, the only available challenge to Citicorp's determination that the project budget was not in balance was a challenge to the reasonableness of that determination. Such a challenge, however, is a claim of nonperformance of the express terms of the contract, not a claim of breach of the implied covenant. That is, if Citicorp's out-of-balance determination was arbitrary and unsupported by the facts, plaintiffs' remedy was to seek damages for Citicorp's breach of its express obligation to make the loan disbursements. As mentioned, *ante,* plaintiffs did initially seek such relief. In opposition to Citicorp's motion for nonsuit, plaintiffs explained their theory that Citicorp breached the express terms of the loan agreement "by its failure to timely fund the requisitions starting in November 1989." They argued that the condition precedent to funding—the determination that the budget was not out of balance—was excused because Citicorp "exercised that discretionary power unreasonably and in bad faith." ■■■ Soon thereafter, plaintiffs dismissed their claim for breach of the specific terms of the contract, impliedly conceding there was no such breach, and pursued only

---

party violates the covenant if it subjectively lacks belief in the validity of its act *or* if its conduct is objectively unreasonable." (*Carma, supra,* 2 Cal.4th at p. 372, italics added.) "[T]he covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." (*Id.* at p. 373; see also *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 796 [79 Cal.Rptr.2d 273].)

[14]On appeal, Citicorp makes no challenge to that instruction. Indeed, the instruction would have been correct had the implied covenant of good faith been applicable here. (See *ante,* fn. 13.) We decline to find that Citicorp has waived the error. Citicorp makes the same point on appeal in a more roundabout way by asserting both that its decision whether the loan was out of balance must be evaluated under the objective test and that the implied covenant of good faith cannot be applied here.

their claim for breach of the implied covenant of good faith.[15] Whether Citicorp breached the express terms of the contract was not an issue before the jury.

 Citicorp mistakenly asserts that the ultimate issue in this appeal is whether Citicorp's out-of-balance determination was objectively reasonable. Because that issue was not properly before the jury on the claim of breach of the implied covenant of good faith, we have no need to analyze whether Citicorp's determination was in fact objectively reasonable. We observe, however, that plaintiffs conceded below that the conditions precedent to funding had not been met. Plaintiffs relied instead on the general rule of contract law that if a party prevents or makes impossible the happening of a condition precedent, the condition is excused. (*Parsons v. Bristol Development Co.*, *supra*, 62 Cal.2d at pp. 868-869; *Jacobs v. Tenneco West, Inc.* (1986) 186 Cal.App.3d 1413, 1418 [231 Cal.Rptr. 351]; see generally 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 765, p. 692.)

At plaintiffs' request, the jury was instructed as follows: "The [loan agreement] contains several conditions that the Old Oakland partnerships had to meet before [Citicorp] was obligated to advance or lend them money under the terms of the [loan agreement]. These conditions must have been met before [Citicorp] was obligated to make loans under the [loan agreement], unless [Citicorp] wrongfully prevented or made it impossible for the Old Oakland partnerships to meet these conditions."

In accordance with that rule, plaintiffs asserted that Citicorp's short funding after November 1989 prevented Old Oakland from attracting new tenants and new investors, hindered Old Oakland from raising needed new capital, prevented Old Oakland from paying its contractors and vendors, prevented payment of the interest on the bonds, and required the Storeks to drain funds from their San Francisco properties to make up the funding shortfalls, ultimately leading to the receivership and bankruptcies on the San Francisco properties.

Yet, plaintiffs' assertions pertain to a claim of breach of the express terms of the contract, not a breach of the implied covenant of good faith and fair

---

[15]We do not suggest, of course, that a breach of the implied covenant of good faith and fair dealing may occur only with a breach of a specific provision of the contract. The opposite is true: a breach of the implied covenant, by itself, will support a contract action. "Were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract." (*Carma, supra*, 2 Cal.4th at p. 373.) We hold only that plaintiffs' remedy was necessarily limited to a breach of the express terms of the contract inasmuch as no covenant to act in good faith can be applied to Citicorp's funding decisions.

dealing. If Citicorp had prevented the loan from being in balance, then the condition precedent would be excused and Citicorp would be liable for breach of its *express* obligation to make the loan disbursements. That legal theory, however, was not pursued in this litigation.[16] Plaintiffs abandoned their claim for breach of express provisions of the contract and pursued only their claim for breach of the implied covenant. Likewise, the instruction given on this point pertained to the question whether Citicorp breached the express provisions of the contract by failing to make the loan disbursements—an issue not before the jury; it had no bearing on the implied covenant of good faith and fair dealing and should not have been given.

In conclusion, we hold that a covenant of good faith and fair dealing cannot be implied so as to prohibit Citicorp from doing what it was expressly permitted to do under the loan agreement—withhold the loan funds when the conditions precedent to its performance had not been fulfilled to its satisfaction. Citicorp had no duty to act in good faith when making its determination of satisfaction; it was required only to make an objectively reasonable decision. The judgment on the cause of action for breach of the implied covenant of good faith must necessarily be reversed.

B. *Fraud*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

IV. DISPOSITION

The judgment is reversed. Costs on appeal are awarded to Citicorp.

Jones, P. J., and Simons, J., concurred.

---

[16]Plaintiffs also made the point at trial that in its November 1989 determination that the project budget was out of balance, Citicorp should not have used cost overruns which existed even before the loan agreement was executed. The leasing criteria set out in the loan agreement required that Old Oakland's "[p]*roposed* . . . cost breakdowns for the [tenant] improvements" be within the limits on the costs per square foot. (§ 3.02(a)(xii)(2), italics added.) Plaintiffs maintain that this language precludes consideration of *past* expenditures. This claim, again, is a claim of breach of the express terms of the contract, not breach of the implied covenant of good faith and fair dealing.

\*See footnote, *ante*, page 44.