Filed 7/23/13  Premier Patio Heating Specialists v. WestAir Gases & Equipment CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PREMIER PATIO HEATING SPECIALISTS, LLC, <br><br>     Plaintiff, Cross-defendant and Appellant, <br><br>     v. <br><br> WESTAIR GASES & EQUIPMENT, INC., <br><br>     Defendant, Cross-complainant and Respondent. | D058776 <br><br><br> (Super. Ct. No. 37-2008-00093766-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County,

Steven R. Denton, Judge.  Affirmed.

Sulzner & Associates and Bruce E. Sulzner for Plaintiff, Cross-defendant and

Appellant.

Higgs Fletcher & Mack, John Morris and James M. Peterson for Defendant,

Cross-complainant and Respondent.

This case involves a dispute over WestAir Gases & Equipment, Inc.'s (WestAir) agreement to purchase Premier Patio Heating Specialists, LLC's (Premier) assets. Premier contends the judgment in favor of WestAir must be reversed because (1) the trial court improperly instructed the jury that it could consider whether WestAir was "honestly and genuinely" dissatisfied (i.e., a subjective test) with the condition of certain assets and instead should have instructed the jury to consider WestAir's purported dissatisfaction based on a "reasonable person" standard (i.e., an objective test), (2) the jury's finding that WestAir performed all of its obligations under the contract is not supported by substantial evidence, and (3) the jury's finding that WestAir acted in good faith is not supported by substantial evidence.

We disagree with Premier's contentions and affirm the judgment in favor of WestAir.

FACTUAL AND PROCEDURAL BACKGROUND

Premier, a business owned by Ed Essey and his wife, leased industrial-grade patio heaters and other items to restaurants and commercial businesses. WestAir, an industrial gas and welding supply company, distributed gases, such as propane and carbon dioxide, gas equipment and welding supplies to various businesses including restaurants. Steve Castiglione was the president of WestAir.

In 2007, Essey called Castiglione to determine whether Castiglione was interested in buying Premier. Castiglione believed the purchase of Premier would allow WestAir to expand its business into the propane patio heater business with its own customer base. Thus, the parties engaged in negotiations regarding the purchase.

2

In November 2007, Essey prepared a summary of Premier's assets and valued them at approximately $1.2 million. The assets included patio heaters, which Essey assigned a replacement value of $550 each, several trucks and various equipment. After further discussions with Castiglione, Essey agreed to decrease the purchase price to approximately $1.1 million by applying an 8.5% discount to his prior valuation.

In February 2008, Castiglione turned over primary responsibility for the potential acquisition of Premier to WestAir's industrial sales manager, Chris Owen. Owen and other WestAir employees researched Premier's business, took a tour of its facility, reviewed Premier's books, financial records, contracts, human resource documents, and did an audit of Premier's business operations.

In June 2008, the parties signed a letter of intent (LOI). The LOI provided basic terms for the proposed transaction between Premier and WestAir, including that WestAir would purchase Premier's assets for $1,096,772. The LOI also allowed for adjustments to the purchase price, stating, "The Purchase Price shall be decreased $500 for each patio heater that is not in good working order or rent-ready condition. If WestAir determines in its sole discretion that the value of any other assets is less than set forth on the [asset list prepared by Essey], it shall adjust the Purchase Price to its best estimate of fair market value for such assets. [Premier] shall have the option to accept or reject the adjusted price for any asset, and if [Premier] reject[s] the adjusted price [it] may retain or otherwise dispose of such assets." The LOI further provided that its principal terms would be incorporated into an asset purchase agreement (APA) and that both parties would agree to "negotiate in good faith and use [their] best efforts to enter into the APA

3

on or before June 30, 2008."  Lastly, the parties included conditions to closing, including "[v]erification, to the satisfaction of WestAir regarding . . . [t]he condition of all [a]ssets."

WestAir expected the parties to carry on negotiations after executing the LOI and it continued to investigate Premier's assets.  In July 2008, Castiglione visited Universal Propane to inquire about purchasing replacement Type 2 quick disconnect valves, which were the type of valves used on Premier's heaters.  Castiglione learned the Type 2 quick disconnect valves were outdated and had safety issues, including that they potentially caused fires.  Castiglione relayed this information to Owen and stated he wanted to adjust the purchase price for Premier's assets to approximately $500,000, which Castiglione thought was the fair market value.

Working from Essey's asset summary, Owen created a spreadsheet and adjusted the price of the assets to approximately $530,000.  As part of that adjustment, Owen reduced the price of the heaters to $250 each.  Owen believed $250 was the fair market value of the heaters based upon his observations and information from WestAir's beverage division manager that some of Premier's heaters were "beat up."  Castiglione also observed some of Premier's heaters at various businesses and noticed they were "pretty beat up," "dented," and "rusty."  Further, Owen stated that Premier's business operations did not meet his safety standards and was informed by another WestAir employee that some of Premier's assets "looked tired."

Owen called Essey to inquire about the fire hazard associated with the heaters and to explain that WestAir wanted to adjust the purchase price.  Essey responded by stating that he was aware of the potential fire risk and a related lawsuit, but was not concerned

4

about the valves. Owen confirmed that WestAir was concerned about the safety risks and informed Essey that he was going to reduce the purchase price to around $500,000. Thereafter, Owen sent Essey a letter stating WestAir was adjusting the purchase price to $530,460 "to reflect [its] best estimate [of] the fair market value of the assets." The letter further explained the price was adjusted because WestAir could purchase new heaters for $368 instead of paying $500 for Premier's used heaters and WestAir was "concerned about the risk of the quick disconnect valves [Premier was] using." Lastly, Owen reminded Essey that under the terms of the LOI, Premier could accept or reject the adjusted price.

Essey did not respond to Owen's letter or subsequent phone calls. Instead, Essey asked his attorney to handle the matter. Premier's counsel then informed WestAir that the purchase price reduction was not permitted by the LOI and WestAir's reasoning for the reduction lacked merit. Accordingly, Premier rejected the price reduction and insisted that WestAir complete the transaction according to the terms of the LOI. WestAir responded by clarifying how they calculated the reduced purchase price and informing Premier that it had prepared an APA. Essey believed the LOI was a binding contract requiring WestAir to pay approximately $1.1 million for Premier's assets and thus, refused to negotiate further regarding the purchase price.

In October 2008, Premier filed an action against WestAir for breach of contract and breach of the implied covenant of good faith and fair dealing. The case was tried before a jury in August 2010. The jury returned a verdict in favor of WestAir, finding, among other things, that there was a contract between the parties, WestAir did all or

5

substantially all of the things the contract required it to do, all conditions had occurred that required WestAir's performance, and WestAir did not fail to do something required by the contract.

## DISCUSSION

### I. *Alleged Instructional Error*

A. Additional Background

During the jury instruction conference, the parties disagreed about a special instruction relating to the satisfaction clause in the contract. WestAir requested the jury be instructed to decide whether it was "honestly and genuinely dissatisfied with the condition of the assets and whether it honestly and genuinely adjusted the purchase price to its belief of the fair market value for those assets." Premier argued for a "reasonableness standard" instead of a "good faith standard" because this was a commercial transaction rather than one involving personal taste or fancy. The trial court agreed with WestAir, reasoning that the good faith standard was appropriate because the language in the contract at issue "reserved to the defendant in this case sole discretion as to the value of the assets and conditions related to the condition of the assets as inspected."

B. Analysis

Premier argues the trial court improperly instructed the jury that it could consider whether WestAir was "honestly and genuinely" dissatisfied (i.e., a subjective test) with the condition of certain assets and instead should have instructed the jury to consider

6

WestAir's purported dissatisfaction based on a "reasonable person" standard (i.e., an objective test).

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) However, it is the duty of counsel for the respective parties to propose complete and correct instructions on all legal theories advanced in the case. (See *Willden v. Washington Nat. Ins. Co.* (1976) 18 Cal.3d 631, 636.) "Instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law." (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718.) Therefore, our inquiry is whether the special instruction correctly and completely stated the law applicable to the satisfaction clause at issue in this case.

"When, as here, a contract provides that the satisfaction of one of the parties is a condition precedent to that party's performance, two different tests are recognized: (1) the party may make a purely subjective decision but it must be made in good faith; or (2) the party must make the decision in accordance with an objective standard of reasonableness." (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 58–59 (*Storek*).) "The choice of objective or subjective test to evaluate a promisor's satisfaction depends upon the intent of the parties, as expressed in the language of the contract. In the absence of a specific expression in the contract or one implied from the subject matter, the preference of the law is for the less arbitrary reasonable person standard. [Citations.] The reasonableness test is especially preferable

7

when factors of commercial value or financial concern are involved, as distinct from matters of personal taste." (*Id.* at pp. 59–60.) "When a promisor has the power under a contract to make a purely subjective decision, that decision must be made in 'good faith,' but the courts will not examine its 'reasonableness.'" (*FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 800.) "While contracts making the duty of performance of one of the parties conditional upon his satisfaction would seem to give him wide latitude in avoiding any obligation . . . , such 'satisfaction' clauses have been given effect." (*Mattei v. Hopper* (1958) 51 Cal.2d 119, 122–123.)

Premier contends the objective standard was applicable in this case because "Westair's satisfaction was tied to its evaluation of the operative fitness and/or mechanical utility of the assets" rather than its fancy, taste or judgment. (Boldface omitted.) In making this argument, Premier gives little weight to the language of the LOI. Although the preference in the law is generally the objective or "reasonable person standard," we must look to the intent of the parties as expressed in their contract. (*Storek*, *supra*, 100 Cal.App.4th at p. 60.)

The LOI gave WestAir wide latitude in adjusting the purchase price. Specifically, it stated, "The Purchase Price shall be decreased $500 for each patio heater that is not in good working order or rent-ready condition. If WestAir determines *in its sole discretion* that the value of any other assets is less than set forth on the [asset list prepared by Essey], it shall adjust the Purchase Price to *its best estimate of fair market value* for such assets." (Italics added.) Further, the parties included conditions to closing, including "[v]erification, *to the satisfaction of WestAir* regarding . . . [t]he condition of *all* [a]ssets."

8

(Italics added.) This language demonstrated the parties intended to give WestAir broad authority to adjust the purchase price for Premier's assets based on its best estimate of their fair market value and to be satisfied with the condition of all assets. Accordingly, the parties expressly gave WestAir subjective discretion in this case.

We are also not convinced by Premier's argument that WestAir's exercise of its "sole discretion" to adjust the purchase price was limited to assets other than the patio heaters. "[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case." (*Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 916, fn. 7.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) Here, although the provision giving WestAir sole discretion to adjust the purchase price referenced "any other assets," it also referred to the asset list prepared by Essey, which included the patio heaters. Given this language and the parties allowing WestAir to verify the condition of *all assets* to its satisfaction before closing, it is clear that the parties intended to give WestAir broad discretion including as to the patio heaters. Thus, we reject Premier's argument.

Based on the foregoing, the trial court did not err in instructing the jury on the subjective standard as applied to the LOI's satisfaction clause.

## II. *Substantial Evidence Supported the Jury's Findings*

A. Standard of Review

Premier's challenges to the jury's factual findings and conclusions, express or implied, are reviewed under the substantial evidence standard of review. (*SFPP v.*

9

*Burlington Northern & Santa Fe Ry. Co*. (2004) 121 Cal.App.4th 452, 462.) Under this standard, we review the entire record to determine whether there is substantial evidence supporting the jury's factual determinations (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874), viewing the evidence and resolving all evidentiary conflicts in favor of the prevailing party and indulging all reasonable inferences to uphold the judgment (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1254–1255 (*Jordan*)). The issue is not whether there is evidence in the record to support a different finding, but whether there is some evidence that, if believed, would support the findings of the trier of fact. (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429–430, fn. 5.) Credibility is an issue of fact for the trier of fact to resolve (*Johnson v. Pratt & Whitney Canada, Inc*. (1994) 28 Cal.App.4th 613, 622) and the testimony of a single witness, even a party, is sufficient to provide substantial evidence to support a factual finding (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614).

B.  WestAir's Performance

Premier argues the jury's finding that WestAir performed all or substantially all of its obligations under the LOI is not supported by substantial evidence. Specifically, Premier contends WestAir failed to meet its obligations under the LOI because WestAir did not provide Premier with "information about the adjusted fair market value of any specific assets." Premier's argument is unavailing.

In making its argument, Premier focuses on Owen's testimony that he prepared a spreadsheet with adjusted asset values to determine the new purchase price for Premier's assets. Premier describes the spreadsheet as "'phantom' documentation" and contends

10

Owens testimony about the creation of the spreadsheet was contrary to his deposition testimony in which he stated he did not have any documentation on how he arrived at the adjusted price of $530,460. Owen's deposition testimony was presented to the jury and we presume the jury considered it. Weaknesses, conflicts, and inconsistencies in the evidence were for the jury to evaluate and our task on appeal is to determine whether any reasonable trier of fact could have reached the same conclusion as the jury did. Premier's citation to evidence from which a jury could have drawn a different conclusion is nothing more than an invitation to reweigh the credibility of the witnesses, something we cannot do in assessing the sufficiency of evidence.

Further, Premier ignores other evidence in the record from which the jury could reasonably conclude WestAir complied with its obligation to provide its best estimate of the fair market value of the assets to Premier. Notably, Owen sent Essey a letter stating WestAir was adjusting the purchase price to $530,460 "to reflect [its] best estimate [of] the fair market value of the assets." Thereafter, WestAir's counsel clarified how WestAir calculated the reduced purchase price. Further, when presented with his deposition testimony, Owen stated he worked with Premier on everything during the negotiations and "it was pretty much open." Based on this evidence, the jury could have reasonably concluded WestAir did all or substantially all of the things it was required to do under the LOI. Accordingly, we decline to reweigh the evidence and credibility of the witnesses and overturn the jury's verdict.

11

C. Good Faith

Premier argues the jury's finding that WestAir acted in good faith is not supported by substantial evidence. We disagree.

In making its argument, Premier focuses on the absence of evidence showing WestAir consulted with outside sources to determine the fair market value of Premier's assets. However, the LOI did not require WestAir to consult with outside sources for its asset valuation. Rather, the LOI allowed WestAir to adjust the price based on "*its best estimate* of fair market value" and verify the condition of the assets to "[*its*] *satisfaction*." (Italics added.) Regardless, WestAir did consult with Universal Propane about the quick disconnect valves and learned they were outdated and had safety issues. WestAir also compared the price of Premier's heaters to new Teeco heaters, which they could purchase for $368.

Further, Premier ignores other evidence demonstrating WestAir acted in good faith. Notably, Owen testified he attempted to negotiate and act in good faith at all times with Essey. After Owen sent Essey a letter indicating the reduced purchase price, he called Essey numerous times and did not get a response. Castiglione also testified he believed the LOI permitted WestAir to "do its due diligence and investigate all of the parts of [Premier's] business." Castiglione went on to state he believed "in good faith" that the value of Premier's assets was only approximately $500,000 and he would have continued discussions if Essey would have returned WestAir's calls. Arguably, Premier thwarted WestAir's ability to continue negotiations and provide further explanation regarding the adjusted purchase price.

12

Premier is again asking us to reweigh the evidence in its favor. However, we must review the entire record, viewing the evidence and resolving all evidentiary conflicts in favor of WestAir and indulging all reasonable inferences to uphold the judgment. (*Jordan*, *supra*, 46 Cal.App.4th at pp. 1254–1255.) Based on the evidence presented at trial, a reasonable jury could conclude WestAir acted in good faith and we will not disturb that finding on appeal.

## DISPOSITION

The judgment is affirmed. WestAir is entitled to its costs on appeal.


McINTYRE, Acting P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.

13