Filed 2/16/16  Samax Development v. Century Community Lending Co. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| SAMAX DEVELOPMENT, LLC et al., | B257652 |
| Cross-complainants and Appellants, | (Los Angeles County Super. Ct. No. EC051593) |
| v. | |
| CENTURY COMMUNITY LENDING COMPANY, LLC et al., | |
| Cross-defendants and Respondents. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Laura A. Matz, Judge.  Judgment affirmed.  Order reversed in part.

Alexander & Yong, Jeffrey S. Yong and John J. Aumer for Cross-complainants and Appellants.

Bergman Dacey Goldsmith, Gregory M. Bergman, Richard A. Fond and Mark W. Waterman for Cross-defendants and Respondents.

_____

**INTRODUCTION**

In this appeal,[1] Samax Development, LLC and its managing member Salah Saleh (Saleh) appeal from a judgment following an adverse ruling on their cross-complaint by a referee appointed pursuant to Code of Civil Procedure section 638, and from an order by the trial court granting the motion by Century Community Lending Company (CCLC) and its parent company Century Housing Corporation (CHC) for attorneys' fees against Saleh.  We affirm the judgment but reverse the award of attorneys' fees against Saleh.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *The Project*

As the referee observed, this case involves the unfortunate demise of a construction project that ultimately resulted in the loss of Saleh's business and residence.  Saleh, who immigrated to the United States from Egypt with a degree in accounting, owned and operated liquor stores.  One of his stores was in North Hollywood, where Saleh and his wife also lived in an adjacent residence.  Saleh wanted to develop the property, and one of Saleh's customers said he had borrowed money from CCLC, a subsidiary of CHC, to build an apartment building.

CHC is a non-profit organization created in 1995.  Its mission is to provide financing for affordable housing in underserved communities.  CHC initially pursued development opportunities, but by 2008 CHC engaged solely in lending for housing subsidized by government programs.  CHC created CCLC in 2005 to access capital from

---

[1]     This is the third appeal in this case.  In *Century Community Lending Co. v. Saleh* (July 24, 2013, B240487) [nonpub. opn.], we reversed the trial court's order denying a motion filed by Saleh's wife, Jackie Saleh, to vacate the entry of default and default judgment against her.  In *Century Community Lending Co. v. Saleh* (Dec. 14, 2015, B255576) [nonpub. opn.], we affirmed the trial court's judgment in favor of Jackie Saleh absolving her of liability as a guarantor of the loan at issue in this case.

a consortium of commercial banks for development projects. CCLC no longer makes loans.

Interested in learning more about CCLC, Saleh visited CCLC's website, which stated, among other things, that CCLC "[h]elps less-experienced developers navigate the complicated process of getting a construction loan" and "[p]rovides technical assistance to borrowers to get them through the development process, from design to construction to lease-up, to ensure the success of their developments." The website also stated that CCLC could provide "[a]ssistance in estimating the total costs of the project . . . [d]etermining overall project feasibility . . . [p]roviding referrals to general contractors . . . [resolving] operational problems and [curing] deficiencies." Saleh had refurbished apartments in the past and wanted to build an apartment building on his property. Because he had no experience with construction loans, he thought technical assistance from CCLC would be helpful. Saleh asked his customer to put him in touch with someone at CCLC.

In 2007 Tracey Burns, a loan officer of CCLC and CHC, contacted Saleh to discuss his proposed project. Saleh told Burns that he did not yet have any plans for his project, and Burns advised him to obtain approved plans and permits before pursuing a loan from CCLC. Seven months later, after Saleh had retained an engineer and an architect to create and obtain approval for the plans, Saleh contacted Burns and they arranged a meeting at the project site. The plans called for demolishing the existing structure and building a 10-unit apartment complex. Saleh and his wife planned to live in one of the units and collect rent from the other units for their retirement.

Burns gave Saleh a construction loan application package, which he and his wife completed with the assistance of a contractor Saleh was considering hiring for the project. Among other questions, the application asked how Saleh intended to satisfy the "owner's equity requirement," and Saleh checked the box marked "Existing applicant equity in property." In the application Saleh also stated he had $800,000 in equity in his property, $85,000 in debt, and no other liens on the property. The application included a personal

3

financial statement in which Saleh reported he had $150,000 in cash, $900,000 in real property, $100,000 cash value in life insurance, and a net worth of $756,000.

At trial Saleh conceded that the numbers he provided in the loan application were only "estimates," a fact he never disclosed to CCLC. He further stated that he should have listed only $50,000 in cash reserves, roughly 90 percent of which actually belonged to various merchants to whom he owed money. He admitted that the life insurance policy identified in the loan application had no present cash value because it was payable only upon Saleh's death and that the real property he listed as a personal asset was actually owned jointly with his sons. Finally, he admitted that he failed to disclose a prior bankruptcy because he believed it was related to a prior entity of his and not to him personally.

B. *The Loan Documents*

Upon receipt of Saleh's loan application Burns prepared several internal "credit memos" and proposed budgets for Stephen Peelor, Senior Vice President of Lending, to submit to the CCLC loan committee. A credit memo prepared on October 23, 2008 proposed a loan amount of $1,702,000 and inaccurately stated that Saleh was operating two markets, had $215,000 in cash, and had a net worth of $2,924,000. Peelor signed this memo and submitted it to the loan committee. The committee revised the loan by, among other things, changing the loan to value ratio from 75 percent to 65 percent. Burns calculated that the loan committee's revised terms reduced the loan amount by $95,000.

Following the loan committee's meeting, Burns sent Saleh a proposed budget that listed line item expenses for the project but did not reflect the loan committee's revisions. Each expense had four corresponding columns listing its "Total Cost," amount "Paid by Borrower," amount "To be Paid by Borrower," and "Loan Amount." The budget did not include any amount under the "To be Paid by Borrower" column and identified $512,000 as the total in the "Paid by Borrower" column, including itemized amounts for building permits, architectural fees, and other expenses Saleh never informed Burns he had actually paid. When Saleh questioned Burns about various inaccuracies in the document,

4

she told him she was "coordinating the numbers to submit" the loan to the committee. Saleh did not press Burns further, assuming she knew what she was doing.

On November 11, 2008 Burns prepared a new internal credit memo proposing a loan of $1,636,00 with a budget showing $95,000 "To be Paid by Borrower" and $512,000 already "Paid by Borrower." She did not correct Saleh's inaccurate financial information reflected in the October 23 credit memo. Peelor submitted this revised credit memo to the loan committee. The committee approved the loan on the condition that Saleh provide 30 percent equity or meet certain bonding requirements for his contractor.

Meanwhile, Saleh had decided against using his original contractor and asked Burns to recommend one. Burns referred Saleh to Scott Choppin of Urban Pacific Construction, Inc. On December 1, 2008 Saleh signed a $1,251,750 cost-plus contract with Urban on behalf of Samax, a company Saleh created for the sole purpose of acting as the borrower and developer for the project. Saleh testified that he did not read the contract with Urban because Burns told him "just to sign it."

At the end of 2008, Burns called Saleh to tell him that the loan had been approved and he should move out of his residence and close the store. Saleh sold his remaining inventory and moved out.

On January 21, 2009 Urban's Accounting and Finance Manager, Lenni Trinidad-Garcia, sent an email to Burns and Choppin proposing revisions to Saleh's loan that would result in a hard cost "shortfall" of $99,254. Trinidad-Garcia reported to Burns that "Salah indicated that he doesn't have $99,254 to put in" and that Saleh would be asking CCLC to increase the loan amount to cover the shortfall. Otherwise, Trinidad-Garcia declared the deal was a "no go."

On January 27, 2009 CCLC sent Saleh a commitment letter for a loan in the amount of $1,636,000. The letter listed the loan's terms, including a $24,200 origination fee and a $2,500 deposit for costs, but did not indicate that the borrower would have to contribute $95,000. Nor did the letter state that the loan amount would cover 100 percent of project costs.

5

Saleh admitted that, although he reviewed the commitment letter, he did not read "every word." He said he relied on Burns to determine the amount of the loan required to complete the project because CCLC stated on its website that the company would provide assistance in estimating the total cost of proposed projects. He made no independent effort to review or examine the project's construction costs or to determine whether the loan amount was adequate to cover the costs. He nevertheless signed the commitment letter on behalf of Samax.

In February 2009 Burns received an email from a CCLC loan administrator informing her that the preliminary title report on Saleh's property included a $130,500 trust deed instead of the expected $85,000 and a tax lien of $67,129.85. CCLC had originally received the title report on December 9, 2008. The record does not reveal why Burns did not learn of these issues or raise them with Saleh before February 2009. Saleh advised Burns that he could not pay the lien or make up the shortfall caused by the trust deed and asked Burns to increase the amount of the loan to cover these items.

On February 26, 2009 Burns prepared a new credit memo for the loan committee requesting an increase of $146,500 in the loan to cover the lien and "general contractor fees." Because this was an internal document, Saleh never saw it. Peelor approved the loan increase, explaining to Burns that approval from the loan committee was not required. He also told Burns that the borrower should pay 20 percent of the increase from its funds. Burns did not disclose this requirement to Saleh in writing but testified she told him about it by phone, which Peelor later stated was uncommon.

On March 10, 2009 Burns sent Saleh a revised budget that did not conform to the format of the original budget from October 2008. The new budget divided project costs into two sections, one for hard costs, such as hardware and roofing, and another for soft costs, such as fees, taxes, and insurance. For each line item in each section there were two columns labeled "Contractor" and "Borrower." The "Borrower" column was further subdivided into two columns called "Equity" and "Loan," presumably to identify amounts in the budget that were to be paid from the borrower's existing or additional equity and those to be covered by the loan. With regard to hard costs, the budget did not

6

relate any specific line item to any amount in the Borrower's Equity or Loan columns. The budget nevertheless included an entry at the bottom of the hard cost section called "Hard Cost Sub-Total" in the amount of $95,000 under Borrower's Equity and $1,055,000 under Borrower's Loan.

Saleh testified that the numbers in the revised budget were inconsistent with the original budget and possibly incorrect, but he never asked Burns to explain them. He said Burns simply sent him the document and asked him to sign it, which he did. Again, Saleh said he trusted CCLC to "come up with the right amount." Burns said that in discussions about this budget she told Saleh he would need to pay the additional $95,000 over the course of the loan, but Saleh denies she ever told him that he had to invest his own money in the project. Saleh said he wanted a loan large enough to cover all construction costs without any additional investment on his part, but he admitted that he never conveyed this expectation to Burns or anyone else at CCLC, nor did he verify whether the documents he signed reflected this expectation.

On March 13, 2009 CCLC sent Saleh a commitment letter for a loan in the amount of $1,782,500. Like the previous commitment letter, this letter did not specify that Samax would have to contribute $95,000 to the project. Saleh signed the letter. On April 8, 2009 Saleh signed the construction loan agreement on behalf of Samax.

C. *The Default and Foreclosure*

Urban demolished Saleh's liquor store and his home shortly after the loan closed. As early as May 12, 2009 Choppin had doubts that Samax could provide evidence of its ability to "put [its] 95k in the deal," as required by the construction contract between Urban and Samax. On June 5, 2009, at a meeting among Choppin, Saleh, and CCLC, Choppin gave Saleh a letter stating that Urban had the right to discontinue work if Samax failed to provide such evidence by July 15, 2009. Saleh contends that this was the first time he learned that the loan documents required Samax to contribute funds to the project. Saleh said he thought the shortfall was attributable to the tax lien that the increased loan amount was supposed to cover.

7

On June 3, 2009 Burns sent Saleh, Choppin, and the loan administrator an email explaining how she had allocated expenses to accommodate the loan. While the money trail is difficult to follow, the email states that Burns reduced the amount of Urban's construction contract to offset the tax lien and that "all parties" agreed that "the $95,000 would come out of the contingency of $205,215, and would be disbursed throughout the course of the loan," leaving a "contingency balance of $110,215." The email does not identify who was responsible for paying the contingency balance, but it does state that "any additional cost overruns outside of the [contingency balance] would have to be made whole from the Borrower."

On June 10, 2009 Saleh signed a revised budget that, unlike the October 2008 or March 2009 budgets, included among "hard costs" a line item for $95,000 in the "To be Paid by Borrower" column. The accompanying email from Burns explained that the revised budget "reflect[s] the $95,000 that will satisfy the contract price."

In June 2009 CCLC determined that the loan was "out of balance," which meant that there were insufficient funds to complete the project based on the cost projections at the time. The loan assumed a project cost of $1,150,000, but by June 2009 Urban estimated the project would cost $1,385,000. It is unclear whether this amount included change orders approved after the loan had closed. Under the loan agreement, Samax was responsible for the shortfall. On June 16, 2009 CCLC notified Saleh and Choppin that it would not fund any more draws on the loan unless Samax could provide, among other things, proof of $95,000 in available funds by June 19, 2009. On June 17, 2009 Urban notified Saleh that it was going to stop work on the project "due to lack of available funding on the construction loan."

Throughout July 2009 Saleh attempted to salvage the loan and the project, meeting with Choppin and CCLC to discuss his options. Among other things, Saleh submitted a bid from another contractor, Saeid Alavi, who had allegedly agreed to cover the difference between his contract price and the loan. CCLC, however, refused to approve Alavi until he submitted a contract, which he never did. On July 20, 2009 CCLC notified Samax the loan was in default.

8

On August 7, 2009 CCLC sent Samax another notice of default because Samax had not yet satisfied its obligation to contribute $95,000 to the project. Saleh attempted to borrow additional funds from CCLC or a third party to cover the shortfall and asked CCLC for a second deed of trust on the property. CCLC refused.

On August 27, 2009 CCLC notified Samax that there were five "events of default": (1) construction had stopped for more than 30 days; (2) the loan was out of balance; (3) Samax had failed to provide an amended construction contract that conformed with the terms of the loan; (4) Samax had not contributed the $95,000; and (5) Samax had not provided proof of sufficient construction insurance. CCLC demanded payment of $507,781.19, the full amount outstanding on the loan at the time. On October 27, 2009 CCLC declared the loan in default and recorded a notice of default. On February 19, 2010 CCLC purchased the property through a nonjudicial foreclosure sale.

D. *The Litigation*

On November 24, 2009 Urban sued Samax, Saleh, CCLC, and CHC for breach of contract and other claims. On May 28, 2010 Saleh and Samax filed a cross-complaint against CCLC and CHC. On March 29, 2011 the court granted a motion by CCLC and CHC pursuant to Code of Civil Procedure section 638 to appoint a referee to hear and determine any and all issues in the case and to render a statement of decision.

The operative first amended cross-complaint alleged causes of action for breach of contract, fraudulent concealment, intentional misrepresentation, breach of the implied covenant of good faith and fair dealing, violation of Business and Professions Code section 17200, and negligence.[2] Most of these claims were based on the allegations that CCLC and CHC concealed or misrepresented the fact that the loan documents required Samax to invest its money in the project and that Saleh never would have signed the loan

---

[2] The first amended cross-complaint also alleged a cause of action for breach of fiduciary duty. The referee sustained a demurrer by CCLC and CHC to that cause of action without leave to amend. Samax and Saleh do not challenge that ruling on appeal.

9

agreement on behalf of Samax had he known that fact. Saleh later testified that, because he had no cash to contribute to the project, he would have simply reopened his liquor store and continued to live on the adjacent premises.

E. *The Motion for Judgment and Statement of Decision*

The referee conducted a seven-day trial in June 2013. At the close of Samax and Saleh's case, CCLC and CHC made a motion for judgment pursuant to Code of Civil Procedure section 631.8. Following additional briefing the referee granted the motion for judgment on the claims by Samax and Saleh for negligence and fraudulent concealment against CCLC and on all claims against CHC. On the remaining causes of action against CCLC, the referee considered all of the evidence submitted at trial and ruled in favor of CCLC.

The referee stated that this case "presents the overarching issue, among other specific issues, of whether CCLC owed Saleh [and Samax] a duty [to] ensure the success of [the] project or whether Saleh abdicated his own responsibility to ensure [its] success." The referee found that the testimony of Burns and Saleh was often contradictory, and that both witnesses were "often lacking in credibility." The referee also found that, although Saleh had presented himself as "a naïve unsophisticated borrower who did whatever Burns advised," his "claimed naïveté was at odds with his background and experience." According to the referee, Saleh "wanted a loan where he would not be required to contribute to construction costs" but never conveyed this expectation to Burns or anyone else at CCLC. The referee noted that Saleh "never sought any advice from any third party and never attempted to read the documents to understand what he was signing," despite the fact that emails from CCLC "routinely invited his review and comment."

As for Burns, the referee found she probably knew that Saleh had limited cash resources and "attempted to juggle the budget to cover the shortfall." The referee also found that the March 2009 revised budget allegedly disclosing the $95,000 contribution requirement was "confusing to read, and virtually impossible to understand." The referee concluded that, although Burns "did not flag" the $95,000 contribution requirement for

10

Saleh, her omission did not "relieve Saleh of his failure to read the loan documents and make sure he understood the details of his $1.7 million project." Finally, the referee found that Burns's efforts to accommodate Saleh were not nefarious. "Her apparent goal was to close the loan for Saleh, not to trick him."

On February 27, 2014 the trial court entered judgment against Samax and Saleh based on the referee's amended statement of decision. (See Code Civ. Proc. § 644, subd. (a).) Samax and Saleh filed a timely notice of appeal.

### F. *The Motion for Attorneys' Fees*

CCLC and CHC moved for an award of attorneys' fees based on the attorneys' fees provision in the construction loan agreement. Saleh opposed the motion to the extent CCLC and CHC sought to recover fees from him personally, arguing that he was not a signatory to the loan agreement and did not personally sue CCLC and CHC for breach of contract. Saleh argued that he sued CCLC and CHC only in tort, and that neither California law nor the loan agreement authorized an award of attorneys' fees on tort claims.

The trial court granted the motion and awarded CCLC and CHC attorneys' fees in the amount of $1,220,545 against Samax. The court ordered Saleh jointly and severally liable with Samax for $213,688 of the total award. Saleh timely appealed, and we consolidated the appeal from that order with the appeal from the judgment.

## DISCUSSION

### A. *Standard of Review*

Under Code of Civil Procedure section 631.8, the court "'"may enter judgment in favor of the defendant if the court concludes that the plaintiff failed to sustain its burden of proof. [Citation.] In making the ruling, the trial court [here, the referee] assesses witness credibility and resolves conflicts in the evidence. [Citations.]"'" (*Plaza Home Mortgage, Inc. v. North American Title Co., Inc*. (2010) 184 Cal.App.4th 130, 135.)

11

"""The standard of review of a judgment and its underlying findings entered pursuant to [Code of Civil Procedure] section 631.8 is the same as a judgment granted after a trial in which evidence was produced by both sides. In other words, the findings supporting such a judgment 'are entitled to the same respect on appeal as are any other findings of a trial court, and are not erroneous if supported by substantial evidence.'"""  (*Ibid.*; see *Fink v. Shemtov* (2012) 210 Cal.App.4th 599, 608 ["[a]n order granting a defense motion for judgment under Code of Civil Procedure section 631.8 in a nonjury trial is reviewed under the substantial evidence standard," and "[w]e review the trial court's express factual findings in the statement of decision, and any implied findings, for substantial evidence"].)  "But we are not bound by a trial court's interpretation of the law and independently review the application of the law to undisputed facts." (*People ex rel. Dept. of Motor Vehicles v. Cars 4 Causes* (2006) 139 Cal.App.4th 1006, 1012.)

B.  *CCLC and CHC Were Entitled to Judgment on the Negligence Claim Because They Did Not Owe Samax and Saleh a Duty of Care*

"To state a cause of action for negligence, a plaintiff must allege (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's damages or injuries." (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 62 (*Lueras*).)  "The general rule in California is that . . . 'each person has a duty to use ordinary care and "is liable for injuries caused by his failure to exercise reasonable care in the circumstances . . . .""" (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*).)  "[I]n the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where 'clearly supported by public policy.'" (*Ibid.*)  "Duty is a question of law for the court, to be reviewed de novo on appeal." (*Id.* at p. 770; see *Strong v. State* (2011) 201 Cal.App.4th 1439, 1449.)

The ordinary lender-borrower relationship is one of the areas of negligence law where the courts have "carv[ed] out an entire category of cases from [the] general duty rule [as] justified by clear considerations of policy." (*Cabral*, *supra*, 51 Cal.4th at

12

p. 772.)  Because "[l]enders and borrowers operate at arm's length," "'[a]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money.'"  (*Lueras*, *supra*, 221 Cal.App.4th at p. 63, quoting *Nymark v. Heart Federal Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096 (*Nymark*).)  Thus, "[l]iability to a borrower for negligence arises only when the lender 'actively participates' in the financed enterprise 'beyond the domain of the usual money lender.'"  (*Wagner v. Benson* (1980) 101 Cal.App.3d 27, 35 (*Wagner*); see *Alvarez v. BAC Home Loans Servicing, L.P.* (2014) 228 Cal.App.4th 941, 948.)  Courts have interpreted "active participation" to include financial participation in the borrower's investment or project and the provision of "extensive" financial and legal advice after the borrower provided the lender confidential information.  (See *Ragland v. U.S. Bank Nat. Assn.* (2012) 209 Cal.App.4th 182, 207; *Barrett v. Bank of America* (1986) 183 Cal.App.3d 1362, 1365; *Kinner v. World Savings & Loan Assn.* (1976) 57 Cal.App.3d 724, 729 (*Kinner*); *Fox & Carskadon Financial Corp. v. San Francisco Fed. Sav. & Loan Assn.* (1975) 52 Cal.App.3d 484, 489.)  Active participation does not include "[n]ormal supervision of the enterprise by the lender for the protection of its security interest in loan collateral."  (*Wagner*, *supra*, 101 Cal.App.3d at p. 35.)

Samax and Saleh argue that CCLC and CHC owed them a duty to disclose the equity requirement and to underwrite the loan "consistent with the source for borrower's equity identified by the borrower," or, in other words, to underwrite the loan without requiring Samax to contribute any cash to the project.  They contend that these duties arose because the actions of CCLC and CHC went beyond the role of a traditional lender, because of the representations on CCLC's website, and because of public policy.  Samax and Saleh argue that the involvement of CCLC and CHC in the loan transaction exceeded the scope of a conventional lender because CCLC operated as if it were a Community Development Finance Institution (CDFI) registered with the Department of the Treasury.  At trial Samax and Saleh introduced expert testimony explaining that CDFI's take on risk by lending to inexperienced borrowers and providing them "technical assistance."

13

CCLC's activities in connection with the loan did not exceed those of a traditional lender or constitute "active participation" giving rise to a duty of care. There was no evidence that CCLC or CHC stood to benefit financially from the loan transaction as a partner in the project's development or that they provided "extensive" financial and legal advice to Saleh or Samax. While CCLC may have provided Saleh some level of assistance with budgeting and the selection of the general contractor, such involvement falls "far short of the extensive control and shared profits which give rise to liability" for negligence. (*Wagner*, *supra*, 101 Cal.App.3d at p. 35.) This result is consistent with the weight of authority concluding that commercial lenders are entitled to pursue their economic interests without regard to their borrower's economic success. (See *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 59 ["[w]ith rare exceptions, a business entity has no duty to prevent financial loss to others with whom it deals directly"]; *Lueras, supra*, 221 Cal.App.4th at p. 68 [banks have no duty to prevent foreclosure]; *Perlas v. GMAC Mortgage, LLC* (2010) 187 Cal.App.4th 429, 436 ["[a] commercial lender pursues its own economic interests in lending money"]; *Sierra-Bay Federal Land Bank Assn. v. Superior Court* (1991) 227 Cal.App.3d 318, 334 ["[a] commercial lender is not to be regarded as the guarantor of a borrower's success and is not liable for the hardships which may befall a borrower"]; *Wagner*, *supra*, 101 Cal.App.3d at pp. 34-35 [bank under no duty to protect the success of plaintiffs' investment ]; *Kinner*, *supra*, 57 Cal.App.3d at p. 732 [lender owes borrower no duty to insure adequacy of construction loan].)

Samax and Saleh argue that the court must still consider the factors set forth in *Nymark* to determine whether public policy imposes a duty of care under the circumstances presented in this case. (See *Nymark*, *supra*, 231 Cal.App.3d at pp. 1098-1100.)[3] They assert that a duty arises here because, among other things, the "negligent conduct at issue (i.e., not communicating the borrower's equity requirement

---

3    Those factors include:  (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm, (3) the degree of certainty that the

14

and not underwriting the loan consistent with the source for borrower's equity identified by the borrower) is sufficiently likely to result in the kind of harm experienced (i.e., foreclosure) to impose liability." The Supreme Court has held, however, that the court determines whether a duty exists by "look[ing] to the entire 'category of negligent conduct,' not to particular parties in a narrowly defined set of circumstances." (*Cabral*, *supra*, 51 Cal.4th at p. 774.) Thus, where foreseeability and policy considerations justify "a categorical no-duty rule" (*id.* at p. 772), concluding otherwise by analyzing the factual specifics of a case would blur the distinction between the legal question whether a defendant owed the plaintiff a duty of care and the factual determination whether the defendant breached that duty. (*Id.* at pp. 772-774.) *Nymark* applied the foreseeability and policy considerations identified by the Supreme Court and concluded that lenders such as CCLC and CHC do not owe borrowers a duty of care when acting within the scope of traditional lending activities. (*Nymark*, *supra*, 231 Cal.App.3d at pp. 1098-1100.) We do not analyze the *Nymark* factors again to determine whether CCLC and CHC, which did not act outside the role of a conventional lender, nevertheless owed Samax and Saleh a duty based on the "negligent conduct at issue" in this case.

Finally, Samax and Saleh argue that CCLC and CHC assumed a duty of care by making statements on CCLC's website describing the services CCLC offers borrowers. These statements included representations that CCLC would "[h]elp the less-experienced borrower navigate the complicated process of getting a construction loan" and "[p]rovide technical assistance to borrowers to get them through the development process." Citing *Hanberry v. Hearst Corporation* (1969) 276 Cal.App.2d 680, Samax and Saleh argue that CCLC's website created a duty to "reasonably perform" these services. *Hanberry*, however, is distinguishable. In that case a third party magazine publisher placed its seal of approval and certification of quality on a product, stating that the magazine

---

plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm. (*Nymark*, *supra*, 231 Cal.App.3d at p. 1098, citing *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650.)

"guarantee[d]" a replacement or refund to purchasers of defective products. (*Id*. at p. 682.) The court held that the magazine publisher could be held liable to consumers who relied on the seal in purchasing the product. (*Id*. at p. 683.) In contrast, Samax and Saleh point only to general advertising statements on CCLC's website that describe in broad terms the services CCLC offered to borrowers. CCLC's website did not "guarantee" any specific result to borrowers; it did not even guarantee to make a loan to any specific borrowers. Samax and Saleh have not cited any authority that imposed a duty of care based on general advertising on a website.

### C. *CCLC and CHC Were Entitled to Judgment on the Fraudulent Concealment Claim Because Samax and Saleh Failed To Prove Fraudulent Intent*

Samax and Saleh argue that the referee erred in finding on their fraudulent concealment claim that neither CCLC nor CHC owed them a duty to disclose the cash contribution requirement. To demonstrate fraudulent concealment, the plaintiff must show (1) the concealment or suppression of a material fact; (2) where the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, that is, to induce reliance; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) resulting damages. (*Bank of America Corp. v. Superior Court* (2011) 198 Cal.App.4th 862, 870-871; *Lovejoy v. AT&T Corp.* (2001) 92 Cal.App.4th 85, 93 (*Lovejoy*).) Knowledge of falsity or scienter is an element of fraudulent concealment. (*OCM Principal Opportunities Fund v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 862-863 (*OCM Principal Opportunities Fund*).)

The duty to disclose a material fact arises where there is a fiduciary relationship, the defendant had exclusive knowledge of material facts unknown to the plaintiff, the defendant actively concealed a material fact, or the defendant made partial representations about material facts. (*Bank of America v. Superior Court*, *supra*, 198 Cal.App.4th at p. 871.) Samax and Saleh alleged that CCLC and CHC owed them a duty

16

to disclose the cash contribution requirement because CCLC and CHC made partial representations about material terms of the loan.[4] (See *Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 347 ["the term 'misrepresent' may encompass situations where someone, having undertaken to provide information regarding a matter, fails to disclose all facts that '"materially qualify" the limited facts disclosed'"]; *Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1164-1165 [duty to disclose arises "when a party to a transaction, who is under no duty to speak, nevertheless does speak and suppresses facts which materially qualify the facts stated"]; *Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 292 [having undertaken to disclose the terms of a transaction, a defendant "is not at liberty to conceal a material term"].)

The referee determined that Samax and Saleh failed to establish that CCLC "provided only incomplete information relative to the borrower equity requirement, and improperly concealed that Samax would need to infuse $95,000." The referee found that, "[w]hile the proposed budgets . . . are arguably unintelligible insofar as identifying a cash infusion by borrower, . . . the number itself is undisputedly included." The referee also found that CCLC supplemented the information contained in the budget with additional loan documents, including the loan agreement, which "fully disclose[d] the obligation to keep the loan in balance." Thus, according to the referee, "[a] fair reading of the loan documents put Saleh on notice of his financial obligations under the loan agreement and specifically of his obligation to invest more equity should the loan fall out of balance."

Samax and Saleh argue that the referee's findings are not supported by substantial evidence. In particular, they contend that CCLC and CHC provided them certain documents purporting to comprise the "complete terms of the Construction Loan, but at each step failed to reveal and suppressed the fact that [CCLC] would later demand that [Samax] infuse $95,000 of its own cash funds after the close of escrow."

---

[4]     Samax and Saleh alleged there was a fiduciary relationship between the parties, but the referee rejected this claim. Samax and Saleh do not challenge this ruling on appeal.

17

We do not review the referee's finding that CCLC and CHC provided incomplete information, however, for substantial evidence. "'In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment . . . . [¶] [W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'''" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 (*Dreyer's*); see *Sonic Mfg. Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.)

The uncontradicted and unimpeached evidence demonstrates here that CCLC and CHC suppressed facts that materially qualified the facts they did disclose to Samax and Saleh. Before the loan closed, CCLC gave Saleh two budgets along with the proposed loan documents. Neither of the proposed budgets nor any other documents CCLC gave Saleh before he signed the loan agreement on behalf of Samax accurately disclosed that the terms of the loan agreement required Samax to commit $95,000 in cash to the project, even if project costs did not increase as a result of change orders or increases in the cost of materials or labor. Indeed, the budgets appear designed to obscure this fact. Although Burns testified that she advised Saleh of the possibility that Samax would have to contribute $95,000 to the project, the referee found Burns's testimony "not credible in light of [her] knowledge that Saleh had insufficient cash available to address the tax lien, the manner in which she moved numbers around in the budget to facilitate Saleh's cash shortfall through use [of] the contingency amounts, and the reasonable inference that Saleh likely would not have gone forward with the project if he realized he had to come up with $95,000 when he had no income." Nor does the fact that the loan agreement references Samax's obligation to contribute an undisclosed amount to the project under

18

some circumstances defeat the fraudulent concealment claim based on partial disclosure. (See *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 241 [oral representations that may have influenced investors' decisions may be actionable fraud even where the written contract contradicts the alleged misrepresentations].) Thus, the evidence leaves no room to support the referee's finding that CCLC provided "[ ]complete information relative to the borrower equity requirement." Instead, the evidence compels the conclusion that CCLC and CHC had a duty to disclose to Samax and Saleh all of the facts regarding the cash contribution requirement, and that CCLC and CHC failed to do so.

CCLC and CHC argue that, even if they were obligated to disclose the cash contribution requirement, the referee's findings in connection with the intentional misrepresentation cause of action that CCLC and CHC did not "intend[ ] to deceive Samax" and that, although Burns may have been "bending over backwards to accommodate Saleh" she was not trying "to trick him," preclude Samax and Saleh from proving the requisite intent for purposes of the fraudulent concealment cause of action. Samax and Saleh argue that these findings do not foreclose their fraudulent concealment claim because the intent required for fraudulent concealment is not the intent to deceive or defraud, but the "intent to *induce conduct*—action or inaction—that differs from what the plaintiff would have done if informed of the concealed fact." (*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 869 (*Blickman*).)

The legal standard the referee used for the fraudulent misrepresentation claim does not accurately reflect the intent requirement for fraudulent concealment. Civil Code section 1709 provides: "One who willfully deceives another *with intent to induce him to alter his position* to his injury or risk, is liable for any damage which he thereby suffers." (Italics added.) (See *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173 [elements of fraud giving rise to tort action for deceit include "intent to defraud, i.e., to induce reliance"]; *Lovejoy*, *supra*, 92 Cal.App.4th at pp. 93-94 ["the only intent by a defendant necessary to prove a case of fraud is the intent to *induce reliance*"].)

19

Although the referee did not apply this standard, her findings of fact nevertheless preclude Samax and Saleh from prevailing on their cause of action for fraudulent concealment. In addition to proving that CCLC and CHC intended to induce reliance, Samax and Saleh also had to prove that CCLC or CHC "intentionally concealed" a material fact to effect such reliance. (See *Bank of America Corp. v. Superior Court*, *supra*, 198 Cal.App.4th at pp. 870-871; *Blickman*, *supra*, 162 Cal.App.4th at p. 868.) The referee found that Burns neither intentionally nor recklessly concealed the cash contribution requirement in the March 2009 budget.[5] Instead, the referee found Burns "was at worst negligent in juggling the numbers in the budget." The evidence in the record does not compel the opposite conclusion. (See *Dreyer's*, *supra*, 218 Cal.App.4th at p. 838.) For example, there is no evidence, through the testimony of Burns or otherwise, that CCLC or CHC knowingly withheld material facts from the March 2009 budget. (Cf. *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, *supra*, 158 Cal.App.4th at pp. 240, 242 [plaintiff stated a cause of action for fraudulent concealment by alleging the defendant investment broker knowingly disseminated report that failed to disclose material facts]; *OCM Principal Opportunities Fund*, *supra*, 157 Cal.App.4th at p. 855 [defendant had requisite scienter for concealment where banker knowingly omitted material facts from offering memorandum].) Because the referee properly found that CCLC and CHC did not have the necessary fraudulent intent, they were entitled to judgment on the fraudulent concealment claim.

---

[5] The referee also found that there was no "proven or even implied motive for CCLC to deceive Saleh or Samax." Motive, however, is not required to prove intent to induce action in connection with a fraudulent concealment claim. Moreover, while CCLC may have been motivated to make loans only to borrowers likely to repay them, CCLC's interests may not have been entirely aligned with the individual interests of employees like Burns.

D. *CCLC and CHC Were Entitled to Judgment on Samax's Breach of Contract Claim Because CCLC and CHC Did Not Breach the Loan Agreement*

Samax alleged that CCLC and CHC breached the loan agreement by declaring the loan "out of balance" and demanding $95,000 after the loan closed. The referee ruled against Samax, finding that section 3.3.1 of the loan agreement required CCLC "to disburse proceeds of the Loan only when the Loan is in balance," as determined by CCLC in its sole discretion.[6]

Samax admits that the loan agreement authorized CCLC to maintain the loan in balance and does not dispute the facts underlying the trial court's ruling on the breach of contract cause of action. Instead, Samax argues that, as a matter of law, CCLC acted "unreasonably" in demanding $95,000 from Samax because that amount was not tied to project costs that had actually been incurred. (See *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 62 (*Storek*) [requiring lender to act reasonably in determining whether loan was out of balance pursuant to loan agreement].) "A decision is unreasonable when it is arbitrary, capricious, or lacking in evidentiary support." (*Id.* at p. 59.)

The loan agreement authorizes CCLC to demand payment from Samax in order to keep the loan in balance even where project costs have not been incurred. Section 3.3.2 provides: "The determination of whether the Loan is in balance may be made by Lender in its sole discretion at any time, including when a request for a disbursement of the Loan is made. . . . The Loan will not be in balance if funds in a single line item or category of the Project budget are, in Lender's sole discretion, insufficient to complete such line item or category." The loan agreement does not require CCLC to limit its calculation to project costs that actually have been incurred. Instead, the loan agreement states that CCLC may make a loan balance determination at "any time" and in its "sole discretion,"

---

[6]     Section 3.3.1 of the loan agreement provides that the loan is in balance when "Borrower has invested sufficient funds into the payment of Project costs so that, in Lender's sole judgment, the undisbursed portion of the Loan plus any funds deposited by Borrower with Lender shall be sufficient to fully complete and operate the Project and to pay all Project costs . . . until the Maturity Date."

thus allowing CCLC to determine that the loan is out of balance based on either estimated or actual costs. Thus, CCLC's determination was not arbitrary, but was based on applicable language in the loan agreement. Moreover, the inclusion of such language in the loan agreement is not unreasonable because it allows lenders to protect their interests when they determine that the borrower is unlikely to complete a project within the approved budget. (See *Perlas v. GMAC Mortgage, LLC*, *supra*, 187 Cal.App.4th at p. 436.) CCLC did not act unreasonably in declaring the loan out of balance. (See *Storek*, *supra*, 100 Cal.App.4th at p. 62.)

Samax also argues that CCLC's actions under the loan agreement were unreasonable because, if CCLC believed Samax owed $95,000 at the time the loan closed, then the loan was already out of balance and never should have closed. Between the loan's closing on April 10, 2009 and CCLC's demand for the $95,000 on June 16, 2009, however, Saleh approved multiple change orders that increased the cost of the project by more than $40,000, and Urban notified CCLC that the cost to complete the project would be approximately $100,000 more than previous estimates. Thus, there was ample evidentiary support for CCLC's determination that the loan became out of balance after it had closed. (See *Storek*, *supra*, 100 Cal.App.4th at p. 62.) CCLC's determination that the loan was out of balance and its subsequent demand for payment were not arbitrary, capricious, or unreasonable.

E.  *CCLC and CHC Were Entitled to Judgment on the Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing*

Samax argues that CCLC and CHC breached the implied covenant of good faith and fair dealing by demanding the $95,000 and halting the project. The referee found that, because the loan agreement authorized CCLC to take such actions, CCLC and CHC did not breach the implied covenant.

"[E]very contract imposes upon each party a duty of good faith and fair dealing in the performance of [a] contract such that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the

22

contract." (*Storek*, *supra*, 100 Cal.App.4th at p. 55.) A court, however, may not imply a covenant of good faith and fair dealing that contradicts the express terms of a contract. (*Ibid.*; see *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1120 [implied covenant may "not be read into a contract to prohibit a party from doing that which is expressly permitted by the agreement itself"].)

CCLC was entitled to demand the $95,000 contribution from Samax pursuant to the terms of the loan agreement. Samax concedes that there can be no breach of the implied covenant of good faith and fair dealing where the express terms of the contract permit the conduct on which the alleged breach of the implied covenant is based. Instead, Samax argues that CCLC breached the implied covenant by acting inconsistently with Burns's June 3, 2009 email stating that she had accounted for the $95,000 as a contingency that would be disbursed throughout the course of the loan.

There is nothing in the record suggesting that Samax made this argument in the trial court, but even if it had Samax cannot base its claim for breach of the implied covenant on an implied obligation not to demand $95,000 when the express terms of the loan agreement allowed CCLC to do just that. (See *Carma Developers (California), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [covenant of good faith and fair dealing may not be implied to vary with express terms of contract]; *Jenkins v. JP Morgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 524 [scope of conduct prohibited by implied covenant of good faith and fair dealing is circumscribed by the express terms of the contract].)[7]

F. *The Award of Attorneys' Fees Against Saleh Must Be Reversed*

The trial court ordered Saleh to pay $213,688 in attorneys' fees. This amount represented the fees CCLC and CHC incurred from February 23, 2010, when Saleh and

---

[7]     Because we affirm the trial court's judgment in favor of CCLC and CHC on all claims, we do not consider whether the referee erred in dismissing the claims against CHC under a theory of agency or respondeat superior.

Samax filed the original cross-complaint, which included a cause of action by both Samax and Saleh for breach of contract, to August 16, 2012, when Saleh and Samax filed the first amended complaint, which removed Saleh as a cross-complainant on the breach of contract cause of action.

CCLC and CHC requested attorneys' fees pursuant to section 10.7 of the loan agreement, which provided that the prevailing party in "any lawsuit, reference or arbitration . . . which arises out of, or which relates to, this Agreement, the Loan Documents or the Loan" is entitled to recover reasonable attorneys' fees and costs. Although Saleh was not a party to the loan agreement, CCLC and CHC argued that he was liable for attorneys' fees incurred in connection with his short-lived claim for breach of that agreement pursuant to Civil Code section 1717, subdivision (a), which provides: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the prevailing party on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."

At the hearing on the motion for attorneys' fees, counsel for Saleh argued that Saleh was not personally liable for the attorneys' fees incurred by CCLC and CHC because the first amended complaint superseded the original complaint and effectively dismissed his cause of action for breach of contract. The trial court disagreed, stating, "We can't just ignore the fact you filed a complaint and caused the other side to incur fees." In its order awarding attorneys' fees, the trial court found that CCLC and CHC were "prevailing parties in this action with regard to the cross-action initiated by Samax and . . . Saleh," and the court ruled that Saleh was jointly and severally liable with Samax for $213,688 of the total award of attorneys' fees of $1,220,545.

"'On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law.'"

24

(*Connerly v. State Personnel Board* (2006) 37 Cal.4th 1169, 1175.) Where, as here, the material facts relevant to the award of attorneys' fees are undisputed and the issue is whether the prevailing party is entitled to attorneys' fees under Civil Code section 1717, the issue is a question of law we review de novo. (See *id.* at p. 1176; see *Morgan v. Imperial Irrigation District* (2014) 223 Cal.App.4th 892, 929 ["[w]here the material facts are undisputed, and the question is how to apply statutory language to a given factual and procedural context, the reviewing court applies a de novo standard of review to the legal determinations made by the trial court"].)

Saleh argues that CCLC and CHC are not entitled to recover attorneys' fees from him because the first amended complaint, which did not include a cause of action by him for breach of contract against CCLC and CHC, superseded the original complaint and operated as a voluntary dismissal of his breach of contract claim. Saleh relies on Civil Code section 1717, subdivision (b)(2), which provides that "[w]here an action has been voluntarily dismissed or dismissed pursuant to a settlement of the case, there shall be no prevailing party for purposes of this section."

Neither party has cited authority addressing the specific issue of whether the voluntary amendment of a cause of action to eliminate a plaintiff operates as a "dismissal" of that cause of action for purposes of section 1717, subdivision (b)(2). We conclude that it does.

"'[A]n amendatory pleading supersedes the original one, which ceases to perform any function as a pleading.'" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 884; see *JKC3H8 v. Colton* (2013) 221 Cal.App.4th 468, 477.) "'The amended complaint furnishes the sole basis for the cause of action, and the original complaint ceases to have any effect either as a pleading or as a basis for judgment. [Citation.] [¶] Because there is but one complaint in a civil action [citation], the filing of an amended complaint moots a motion directed to a prior complaint.'" (*JKC3H8 v. Colton*, *supra*, 221 Cal.App.4th at p. 477; see *State Compensation Ins. Fund v. Superior Court* (2010) 184 Cal.App.4th 1124, 1130-1131.)

25

Moreover, "an amended complaint that omits defendants named in the original complaint operates as a dismissal as to them." (*Fireman's Fund Ins. Co. v. Sparks Construction, Inc.* (2004) 114 Cal.App.4th 1135, 1142.)  This is so even when the plaintiff does not file a request for dismissal because "the first amended complaint itself would constitute the necessary request for dismissal." (*Ibid.*; see *Kuperman v. Great Republic Life Ins. Co.* (1987) 195 Cal.App.3d 943, 947 [filing of amended complaint that omitted a defendant as a party effected a dismissal of that defendant from the action].)  The same reasons apply where, as here, the plaintiff files an amended complaint that omits a cause of action against a defendant while continuing to assert others:  the omitted claim is effectively dismissed and "'ceases to have any effect . . . as a basis for judgment.'" (*JKC3H8 v. Colton*, *supra*, 221 Cal.App.4th at p. 477.)  There is no reason to require Saleh to file a formal request for dismissal of his breach of contract cause of action after withdrawing it by amendment.  (See *DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387-388 [statutes should be interpreted to effectuate the purpose of the law]; *Gong v. City of Rosemead* (2014) 226 Cal.App.4th 363, 372 [same].)[8] Therefore, the court erred by awarding attorneys' fees against Saleh.

## DISPOSITION

The judgment is affirmed.  The order awarding attorneys' fees is reversed as to Saleh.  CCLC and CHC are to recover their costs on appeal from Samax.

SEGAL, J.

We concur:

PERLUSS, P. J.                                                    ZELON, J.

---

[8]     CCLC and CHC do not argue that Saleh is liable for attorneys' fees as a nonsignatory third party beneficiary of the loan agreement or as a party who "stands in the shoes" of Samax.  (See *Cargill, Inc. v. Souza* (2011) 201 Cal.App.4th 962, 966-967.)

26