Filed 1/29/21  Waterview Development v. Tai CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| WATERVIEW DEVELOPMENT, LLC,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>VINCENT T.C. TAI,<br><br>     Defendant and Respondent. | A155077<br><br>(San Francisco County<br>Super. Ct. No. GCG-13-536038) |

Waterview Development, LLC (Waterview) sued Vincent T.C. Tai (Tai) over a purchase and sale agreement regarding an undeveloped lot owned by Tai.  Waterview alleged breach of contract, fraud, and negligent misrepresentation, and sought specific performance as well as damages; after a bench trial, judgment was entered for Tai.  Waterview now appeals, arguing that the trial court misinterpreted the agreement.  We conclude that Waterview fails to show error, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are largely undisputed, though their legal significance is contested.  We draw this summary from unchallenged portions of the trial court's statement of decision, uncontradicted testimony, and documents admitted into evidence.

A.      *The Purchase and Sale Agreement*

The dispute arises from a purchase and sale agreement (PSA) for an undeveloped lot located at 1111/1117 Sansome Street on Telegraph Hill in San Francisco (the Property) that is owned by Tai.  The Property, which rises from Sansome Street on a steep incline, was subject to an easement recorded in 2011 by John Sanger (Sanger Easement).

Walid Mando, a self-described architect/developer, contacted Tai in January 2013 expressing his interest in purchasing the Property or entering a joint venture to develop it.[1]  Tai disclosed the existence of the Sanger Easement to Mando, who was aware of it as of February 1.

On June 9, Mando and Tai signed a 14-page PSA that Mando had prepared.  As required by the PSA, Mando paid a $10,000 deposit into escrow. Under the terms of the PSA, Mando agreed to purchase the Property, "as is" and subject to all recorded easements, for $650,000.  Mando subsequently assigned his rights under the PSA to Waterview, of which he is the sole owner.

1.      *Conditions for Close of Escrow*

The close of escrow, and the purchaser's obligations to purchase the Property, were subject to a number of conditions, including those set forth in Section 3.05(a) of the PSA, which we reproduce here.

"Beginning on the day this Agreement is executed by both parties and continuing until the later of (i) ninety (90) days after the day that all Property Documents (as defined and described in Section 6.13[2]) have been

---

[1] All dates are in 2013 unless otherwise stated.

[2] The term "Property Documents" is defined as "(i) existing topography maps and surveys, (ii) all existing current reports pertaining to the Property, (iii) all warranties and guaranties relating to the Property that are in Seller's possession; (iv) all permits and governmental correspondence and notices

delivered to Purchaser or (ii) September 10, 2013 (the "Due Diligence Period"), Purchaser (and any agents and consultants retained by Purchaser) shall have the right to examine and inspect the Property, to investigate the condition of title, zoning, entitlement, development potential, value and usefulness of the Property, and to determine the suitability of the Property for the use and development contemplated by Purchaser. It is anticipated that during this period Purchaser, both directly and through its agents and consultants, will conduct physical examinations of the Property (including soils tests and environmental review), and will examine the condition of title, zoning, and the value of the Property, and all prior applications for permits or approvals and development rights related to the Property. Purchaser shall also have the right, during this period and at Purchaser's expense, to obtain a current or updated survey of the Property. It is understood that access to the Property shall be subject to the terms of Section 6.13 below.

"It shall be a condition of Close of Escrow and of Purchaser's obligations to purchase the Property that Purchaser, in its sole discretion, has approved the physical condition and value and development potential of the Property (including without limitation its environmental condition) and the condition of title and zoning, and has determined that the use and development limitations and opportunities of the Property are satisfactory to Purchaser in his sole discretion, and has notified Seller that the Property is satisfactory to Purchaser. *If Purchaser shall fail to notify Seller in writing prior to*

---

relating to any [*sic*] Property; (v) a current title report, together with copies of all exceptions to title; (vi) preliminary grading plans; (vii) all reports concerning the physical condition of any [*sic*] Property that are in Seller's possession; (viii) all soil reports, studies, and materials relating to the Property; (ix) any environmental site assessments relating to the Property; and (x) the bill for Property Taxes for the current tax year."

3

*expiration of the Due Diligence Period that the Property is satisfactory and that this condition is satisfied, then this condition shall be deemed not satisfied and this Agreement shall automatically be terminated and escrow canceled with no further liability of either party hereunder except as otherwise expressly provided in this Agreement.*"  (Italics added.)

2.     *Access Requirements*

Section 6.13 of the PSA required Tai to provide access to, and information about, the Property as follows:

"Seller hereby grants Purchaser and its agents and consultants access to the Property at all reasonable times prior to the Close of Escrow for the purpose of examining and inspecting the Property and performing environmental tests and surveys, and shall promptly make available to Purchaser and its agents and consultants all information and documents regarding the Property in Seller's possession that Purchaser or its agents or consultants may reasonably request from time to time . . . .  Without limiting the generality of the foregoing, not later than three (3) business days after the date this Agreement has been executed by both parties, Seller shall deliver to Purchaser complete copies of the [Property Documents], to the extent not already delivered to Purchaser[.] . . . Copies of any documents materials or notices pertaining to the Property that come into Seller's position prior to Close of Escrow and have not previously delivered [*sic*] to Purchaser shall be immediately delivered to Purchaser."

In addition, Section 6.13(b) states, "Seller shall provide such cooperation in connection with Purchaser's investigation and due diligence as Purchaser may reasonably request from time to time, but at no out-of-pocket expense to Seller."

4

3. *Other Terms*

The PSA included a "Liquidated Damages" provision stating that the purchaser's deposit was "expressly non-refundable" except under certain conditions, and that the deposit was to be paid to the seller as liquidated damages in the event of the purchaser's breach or default. We discuss this provision further below.

In addition, the PSA provided, "Time is of the essence of this Agreement," and the PSA included an integration clause, which stated as follows: "The terms of this Agreement are intended by the parties as the final expression of their agreement with respect to such terms as are included in this Agreement and may not be contradicted by evidence of any prior or contemporaneous agreement or discussions. This Agreement also constitutes the complete and exclusive statement of its terms, and no extrinsic evidence whatsoever regarding the terms hereof may be introduced in any judicial or other proceeding involving this Agreement. No term or condition of this Agreement shall be deemed amended or waived except by a written instrument executed by the party against whom enforcement of such amendment or waiver is sought."

B. *Due Diligence Period*

On July 31, Mando sent Tai an email in which he stated that "the unusually tight restrictions of the [Sanger Easement] are inconsistent with the soil investigation and geotechnical testing that are integral to proper due diligence. For this reason, I do not see how we can avoid adjusting the due diligence period to take account of the [Sanger Easement] interference.

5

Perhaps you can facilitate access by obtaining a waiver from John Sanger . . . ."[3]

On September 10, the earliest date on which the Due Diligence Period specified in the PSA could have ended, Mando sent an email to Tai in which he stated that he was waiting for locks to be removed from a gate so he could access the Property, and that he had not received three categories of documents about the Property: the current property tax bill, a copy of the hazard and liability insurance policy for the property, and "[a]ll records regarding the condition and maintenance of the property including operation and maintenance contracts of the property and insurance contracts and policies."[4] On the evening of September 10, Tai sent Mando an email reporting that the chain on the gate had been cut. Tai attached the current property tax bill, and the insurance declarations expiring in July 2013 and July 2014, and stated, "As far as I know, for the past years there are no records and maintenance contracts for this property."

---

[3] The purpose of the Sanger Easement, as stated in its Recitals, was "preserving and protecting the Easement Area in its current undeveloped and geologically and geophysically unchanged state with its existing vegetation undisturbed." The relevant "restrictions," as identified by Waterview at trial and on appeal, appear in the following portion of the easement agreement: "3. **Prohibited Uses.** Any activity on, use or development of the Easement Area that is inconsistent with the purpose of the Easement, including but not limited to any excavation or grading or the erection of any building, billboard, radio or telephone towers, signs, or any other physical structure or the removal of vegetation which is not dead or diseased, all of which are prohibited."

[4] The PSA defined the Property Documents to include the current property tax bill, and various reports. The PSA also required Tai to maintain hazard and liability insurance on the Property.

On September 25, Mando sent Tai an email stating that his consultants "need to obtain soil samples from at least six locations on the Property, four of which are on the [Sanger Easement.] The [Sanger Easement] prevents such testing and investigation." Mando wrote that in order to provide "the opportunity to adequately inspect and examine the Property," Tai was required to remove the Sanger Easement, enlarge the current 3-foot wide accessway to the Property to 12 feet, and clear debris and dead trees. Mando further wrote, "Section 3.05 of the [PSA] provides that the Due Diligence Period continue until 90 days after all of the Property Documents are delivered. You did not deliver the last of the Property Documents until September 10, 2013, assuming these were the last remaining documents you have. The Due Diligence Period will be further extended so long as the encumbrance/easement and access issues remain open."[5]

Tai responded by email on October 4, rejecting the position that he was required to remove the Sanger Easement or perform any site preparation work. As to access to the property for testing, Tai wrote, "If your view of the [Sanger Easement] is that you need Sanger's permission before you could do any testing in any affected area, you are free to seek that permission. To the extent the easement controls, it is a pre-existing right that is a matter of record, and I lack any greater right. The easement binds both you and me and everybody else. That said, I am not sure I necessarily agree with you that you need Sanger's permission before you could do the testing that you desire (concerning which testing I have no information in any event)." Tai acknowledged that he had not provided the last of the Property Documents

_____

[5] On appeal, Waterview does not challenge the trial court's finding that the PSA did not require Tai to remove any easements recorded against the Property.

7

until September 10, and wrote, "If on that basis you want to extend the due diligence period to 90 days therefrom; i.e., December 9, . . . I can and will have no objection." Tai testified at trial that as of October 4, there was nothing further he needed to do to help Mando get access to the Property.

Mando replied on October 31 that Tai's position with respect to access to the Property "leaves me with no choice but to have my attorney handle this situation."

At trial, Mando testified that he did not believe the Due Diligence Period had ended on December 9: he said, "The end of due diligence period is supposed to be happening after I get access to the property and do my testing." He acknowledged that the PSA did not state that, but claimed it was "implied by contract."

There is no dispute as to the following: as of December 9, Waterview did not notify Tai that the Property was satisfactory, which was a condition of the close of escrow according to section 3.05(a) of the PSA. Nor did Waterview explicitly terminate the PSA, or close escrow.

On December 10, Waterview filed suit against Tai.

C.    *Proceedings in the Trial Court*

Waterview filed the operative Fifth Amended Complaint (Complaint) in March 2016 alleging causes of action for specific performance, fraud, and negligent misrepresentation.

A four-day bench trial took place in January 2018. The court heard testimony from Mando, from Waterview's expert, and from Tai, and reviewed the parties' joint stipulations of facts regarding the testimony of Sanger. Fifty-seven exhibits were admitted into evidence.

After the parties submitted closing and rebuttal briefs, the trial court issued its tentative statement of decision. Waterview filed extensive

objections to which Tai responded. Subsequently the court issued its statement of decision and order for entry of judgment.

The court concluded that the Due Diligence Period was triggered by Mando's receipt of the Property Documents on September 10, and the Due Diligence Period ended 90 days later, on December 9. Because the purchaser did not notify Tai in writing that the Property was satisfactory, the PSA terminated by operation of its terms (specifically, section 3.05(a)), on December 9, and under the liquidated damages provision Mando's deposit was not refundable. Judgment was entered for Tai on Waterview's three causes of action, and the court ordered that under the terms of the PSA, the deposit was to be paid to Tai, and Waterview was to pay Tai's attorney fees. Waterview timely appealed.

## DISCUSSION

On appeal, Waterview argues that Tai breached the PSA by failing to cooperate in providing access to the Property; therefore, according to Waterview, the trial court erred in finding that Tai did not default on his obligations under the PSA prior to December 9, and in finding that the Due Diligence Period was triggered on September 10 and expired on December 9, at which point the PSA terminated according to its terms. Waterview further argues that the court erred in its interpretation of the liquidated damages clause in the PSA, and that even if the trial court had been correct in finding that the PSA terminated on December 9, Waterview did not forfeit the $10,000 deposit. The arguments lack merit.

A.    *Standard of Review*

We review the interpretation of a contract de novo, "according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect." (*Parsons v. Bristol Development Co.* (1965)

9

62 Cal.2d 861, 865, citing Civ. Code, §§ 1635-1661 and Code Civ. Proc., §§ 1856-1866.) "Any contract must be construed as a whole, with the various individual provisions interpreted together so as to give effect to all, if reasonably possible or practicable. [Citations.] Courts must interpret contractual language in a manner which gives force and effect to *every* provision, and not in a way which renders some clauses nugatory, inoperative or meaningless. [Citations.] The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. [Citations.] The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent acts and conduct of the parties. [Citations.]" (*City of Atascadero v. Merrill Lynch, Pierce, Fenner and Smith, Inc.* (1998) 68 Cal.App.4th 445, 473-474.) In particular, "[t]he conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions." (*Kennecott Corp. v. Union Oil Co.* (1987) 196 Cal.App.3d 1179, 1189.)

" 'When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is "reasonably susceptible" to the interpretation urged by the party. If it is not, the case is over. [Citation.]' " (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448.)

B.    *The PSA Terminated of Its Own Accord on December 9, 2013*

Waterview's primary argument on appeal is that Tai breached the PSA by failing to fulfill its duty to cooperate with Waterview's investigation of the

10

Property, specifically by not providing Waterview and its consultants with access to the Property to perform environmental tests and surveys. Waterview's theory is that as a result of Tai's breach, Waterview was unable to determine whether the Property was satisfactory. Therefore, the Due Diligence Period never began, or if it did, it did not end. In any event, Waterview contends it was relieved of its obligations under the PSA, including its obligation to inform Tai that the Property was satisfactory as a condition of the close of escrow, and the PSA did not terminate. We are not persuaded.

Waterview relies on section 6.13 of the PSA, which grants the purchaser access to the property for purposes of inspection and requires the seller to cooperate with the purchaser's investigation, "but at no out of pocket expense to Seller," and section 3.05(a), which makes the purchaser's approval of the condition of the Property a condition of the close of escrow. But Waterview ignores the fact that section 3.05(a) explicitly establishes that the Due Diligence Period runs until the later of 90 days after the Property Documents are delivered to the purchaser or September 10.[6] During the Due Diligence Period, Waterview has the right to examine and inspect the property, but nothing in section 3.05(a), or anywhere else in the PSA, states that the timing of the Due Diligence Period is established by access to the Property.

---

[6] Waterview contends that there are "unusual geotechnical issues involved with the Property," and that the parties agreed to the 90-day Due Diligence Period so that Waterview could satisfy its concerns about the stability of the steep hillside. Regardless, the PSA is unambiguous that the Due Diligence Period begins to run when the Property Documents are delivered to the purchaser.

11

Waterview argues that until there was access to the Property, the purchaser cannot exercise its sole discretion to determine whether the Property is satisfactory. Even if we accept that proposition, it does not help Waterview, because there is no dispute that access to the Property was provided as of September 10, when locks were removed from the existing gate. Contrary to Waterview's argument, nothing in the PSA required Tai to "obtain[ ] permission from the easement holder and/or ensur[e] a safe path of travel through the Property." And nothing in the PSA required Tai to take steps such as enlarging the accessway to the Property or clearing debris, which would have imposed costs on Tai. Waterview does not dispute that before the PSA was signed, Mando and Tai did not discuss modification of the Property to allow access for inspection.

Section 6.13, which allows the purchaser and its agents and consultants access to the Property for purposes of examination and testing, does not obligate the seller to modify the Property or remove debris, or do anything else that imposes out-of-pocket expenses on the seller. Instead, section 6.13 is a license to the purchaser because it gives the purchaser "authority from the owner to perform an act or acts upon the property."[7] (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 36.) "[A] license does not create or convey any interest or estate in the real property; it merely makes lawful an act that otherwise would constitute a

_____

[7] Section 6.13 also requires the purchaser to indemnify the seller against "claims of personal injury, death, or property damages arising from any inspection or testing of the Property or any part thereof or any activity on or about the Property by Purchaser or its consultants or agents" as well as against "claims for mechanics' liens or similar claims arising from inspections of the Property or any work performed on the Property by Purchaser or its consultants or agents."

trespass. . . . 'A license in this sense is a personal privilege conferred either by a written or oral agreement, to perform a certain act or acts without conferring any interest in the land.' " (6 Miller & Starr, Cal. Real Estate (4th ed. 2020) § 15:2.)

Waterview gains nothing by framing its argument in terms of a breach of the implied covenant of good faith and fair dealing. Waterview does not contend that Tai took affirmative steps to prevent testing or inspection of the Property. The implied covenant does not impose obligations that are contrary to the express terms of the agreement. (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 55.) Because the PSA is explicit that Tai need not incur any out-of-pocket expense in cooperating with access to the property, the implied covenant cannot require Tai to incur such expenses by modifying the property or removing vegetation or debris. And because the PSA stated that the Property would be taken "as is" subject to recorded easements, Tai had no obligation to "obtain[ ] a waiver" of the Sanger Easement or permission from Sanger for Waterview to conduct the desired testing, even assuming that a waiver or permission was necessary.[8]

In its opening brief, Waterview contends that even though the PSA has a "time is of the essence" clause, Tai waived that provision by allowing the September 10 due diligence deadline to pass. The implication, apparently, is that the waiver of the provision supports Waterview's position that the Due

---

[8] Waterview points to nothing in the record that shows precisely what testing was envisioned. And Waterview presents no argument or authority as to how the language of the Sanger Easement was to be construed: Waterview simply points to Mando's statement to Tai that the testing was forbidden by the easement, and asserts that "Mando was concerned that geotechnical evaluation and taking soil samples would violate the [Sanger Easement]."

Diligence Period was indefinitely extended and the PSA did not terminate. Tai claims that Waterview forfeited this issue by failing to raise it in the trial court, and Waterview offers no rebuttal to that point in its reply brief. Even if the argument had not been forfeited, it would be of no avail. The argument ignores the plain language of the PSA, which provides in section 3.05(a) that the Due Diligence Period extended to the *later* of September 10 or 90 days after the Property Documents had been delivered to the purchaser. Waterview does not point to anything that suggests that Tai waived the "time is of the essence" provision: to the contrary, Tai's October 4 email, in which Tai agreed to extend the Due Diligence Period to December 9, 90 days from the date when the last of the Property Documents were provided, is evidence that Tai did not waive the provision.

In sum, Waterview has not shown any error in the trial court's finding that Tai did not default on his obligations under the PSA. Nor has Waterview shown any error in the court's findings that the Due Diligence Period began on September 10, when Mando received the last of the Property Documents, that the Due Diligence Period ended 90 days later, on December 9, and that the PSA terminated on December 9 pursuant to the terms of section 3.05(a).

C.    *Waterview Has Forfeited the Escrow Deposit*

Waterview argues that even if the PSA terminated on December 9 by virtue of its failure to notify Tai that the Property was satisfactory, the trial court erred in concluding that Waterview had forfeited the $10,000 escrow deposit. Tai argues the merits of the issue, and also argues that Waterview waived or forfeited its argument regarding the deposit by failing to raise the issue below. It would have been better practice for Waterview to raise the issue as part of its objections to the trial court's tentative statement of

14

decision; nevertheless, in light of Waterview's concession that the issue raises a pure question of law concerning the interpretation of the PSA on undisputed facts, we exercise our discretion to address it. (*RN Solution, Inc. v. Catholic Healthcare West* (2008) 165 Cal.App.4th 1511, 1518.)

1.    *Additional Background*

The PSA includes provisions that address whether the $10,000 deposit is refundable.

Under section 2.02 of the PSA, the deposit "shall be refundable to Purchaser until the condition set forth in Section 3.05(a) has been satisfied or waived, and thereafter shall be non-refundable (unless escrow fails to close by reason of Seller's default or failure of a condition of closing) and shall be paid to Seller pursuant to Section 5.01 below in the event escrow fails to close by reason of Purchaser's default."

Section 5.01, entitled "Liquidated Damages," states in relevant part:

"The Deposit is expressly non-refundable except if Purchaser terminates this agreement (i) prior to expiration of the Due Diligence Period, as permitted under Section 3.05(a), or (ii) as otherwise permitted under section 3.05 by reason of a default by Seller or the failure of any condition to Purchaser's obligation to close escrow. Moreover, should escrow fail to close due to Purchaser's breach or default hereunder, then Seller shall be released from its obligation hereunder to sell the Property, and the Deposit paid under Section 2.02(a) and (b) shall be retained by or paid to Seller as liquidated damages."

Section 3.05(a) allows the purchaser to terminate the agreement during the Due Diligence Period by providing written notice to the seller that the property is not satisfactory. In addition, section 3.05 allows the purchaser to terminate by providing written notice to the seller in case of failure of a

15

condition of escrow, including default or breach by the seller of conditions concerning the close of escrow.[9]

In its statement of decision, the trial court concluded as follows: under 5.01 of the PSA, the deposit "is 'expressly non-refundable' except if Waterview terminates the PSA prior to expiration of the Due Diligence Period or by reason of the failure of any condition to Waterview's obligation to close escrow. Because the contract was terminated by Waterview's implicit dissatisfaction with the property's condition, Tai is entitled to the money deposited in the escrow account." The court directed Waterview "to pay, or cause escrow to pay, Defendant Tai the moneys currently held in the escrow account as liquidated damages due to the termination of the PSA on December 9."

2.    *Analysis*

Waterview argues that by virtue of the language in sections 2.02 and 3.05(a), the PSA "explicitly states that the deposit is not forfeited if Waterview does not notify Seller that the condition of the Property is satisfactory." As we shall explain, we disagree. Waterview further argues that, in light of sections 2.02 and 3.05(a), we must interpret section 5.01 to mean that the deposit was not forfeited in the circumstances here. Again, we disagree.

Section 2.02(a) of the PSA provides that the deposit is refundable "until the condition set forth in Section 3.05(a) has been satisfied or waived."[10]

_____

[9] Waterview does not contend that it provided written notice of termination to Tai, nor does it contest the trial court's finding that as of December 9, 2013, the end of the Due Diligence Period, Waterview did not explicitly terminate the PSA.

[10] The "condition set forth in Section 3.05(a)" is that the purchaser has determined that the Property is satisfactory and so notified the seller in

16

Neither of those things happened here; Waterview let the Due Diligence Period lapse. Thus, under section 3.05(a), Waterview's failure to notify Tai that the Property is satisfactory means that the condition is "deemed not satisfied," *and* that the agreement "automatically . . . terminate[s]," and escrow is "canceled with no further liability of either party hereunder *except as otherwise expressly provided in this Agreement*." (Italics added.)

Waterview would have us interpret section 2.02(a) to mean that as long as Waterview has not stated that the property is satisfactory, the deposit remains refundable after the contract has automatically terminated. That interpretation is inconsistent with the principle that we interpret individual provisions in the context of the contract as a whole, which requires us also to consider section 5.01, which states that the deposit is non-refundable unless the purchaser terminates the agreement *before the expiration of the Due Diligence Period*, or the purchaser terminates the agreement as otherwise permitted by section 3.05.

We can harmonize the statement in section 2.02(a), which states that the deposit is refundable only until a certain point, with the statement in section 5.01, which states that the deposit is non-refundable unless certain conditions are met, by interpreting section 2.02(a) as applying for the duration of the Due Diligence Period. Until the Due Diligence Period ends, Waterview, as the seller, has discretion to terminate the PSA, and if it does so, the deposit is refundable, as provided by both section 2.02(a) and 5.01. But once the Due Diligence Period has ended, under section 2.02(a) and 5.01, the deposit is not refundable unless Waterview terminates after a breach or

_____

writing. We need not consider whether the condition was waived, because Waterview does not argue the point.

17

default by the seller, Tai.  There being no such breach or default by Tai, the deposit is nonrefundable.

## DISPOSITION

The judgment is affirmed.  Respondent shall recover his costs on appeal.

 

                               _____

                               Miller, J.

WE CONCUR:

_____

Kline, P.J.

_____

Stewart, J.

A155077, *Waterview Development, LLC v. Tai*